# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022

(Argued: December 8, 2022     Decided: July 25, 2025)

Docket No. 21-650

TYRONE WALKER,

*Plaintiff-Appellant,*

−v.−

DEPUTY COMMISSIONER JOSEPH BELLNIER, SUPERINTENDENT DONALD UHLER,
UPSTATE CORRECTIONAL FACILITY, DEPUTY SUPERINTENDENT OF SECURITY
PAUL P. WOODRUFF, UPSTATE CORRECTIONAL FACILITY, DEPUTY
SUPERINTENDENT OF PROGRAMS JOANNE FITCHETTE, UPSTATE CORRECTIONAL
FACILITY, OFFENDER REHABILITATOR COORDINATOR MELISSA A. COOK,
UPSTATE CORRECTIONAL FACILITY, JAMES A. O'GORMAN,

*Defendants-Appellees.*

B e f o r e :

CARNEY, MENASHI, and ROBINSON, *Circuit Judges.*

This is a case about process. When the Constitution requires process, it is a "bedrock" principle that the process due must be afforded "at a meaningful time and in a meaningful manner." *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001) (quoting

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). In 2014, after he had been in solitary confinement for punitive reasons starting in 2000, prison officials placed Plaintiff-Appellant Tyrone Walker in solitary confinement as a preventative measure, based on a determination that he posed a threat to prison security if housed in the general prison population. Having done so, those officials were constitutionally obligated to conduct a regular, meaningful review of Walker's solitary confinement when he was housed in those conditions. *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1985); *Proctor v. LeClaire*, 846 F.3d 597, 610–11 (2d Cir. 2017); *see H'Shaka v. O'Gorman*, 758 F. App'x 196, 199 (2d Cir. 2019) (summary order).

We express no view as to whether Walker should have been transferred to the general population at some point during that five-year period. But Walker was entitled to meaningful process assessing that question. And, construing the record evidence in the light most favorable to Walker, as we must at the summary judgment stage, we conclude that a reasonable jury assessing the record could find that the reviews that he received during his continued solitary confinement were not constitutionally meaningful.

Accordingly, we **VACATE** the district court's judgment and **REMAND** the case for proceedings consistent with this opinion.

Judge Menashi **DISSENTS** in a separate opinion.

———————

DONALD L. R. GOODSON, Institute for Policy Integrity, New York, NY (Robert M. Loeb, Orrick, Herrington & Sutcliffe LLP, Washington, DC, *on the brief*), *for Plaintiff-Appellant*.

BEEZLY J. KIERNAN, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Victor Paladino, Senior Assistant Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees*.

———————

CARNEY, *Circuit Judge*:

This is a case about process. When the Constitution requires process, it is a "bedrock" principle that the process due must be afforded "at a meaningful time and in

a meaningful manner." *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). In 2014, after he had been in solitary confinement for punitive reasons starting in 2000, prison officials placed Plaintiff-Appellant Tyrone Walker in solitary confinement as a preventative measure, based on a determination that he posed a threat to prison security if housed in the general prison population. Having done so, those officials were constitutionally obligated to conduct regular, meaningful reviews of Walker's solitary confinement when he was housed in those conditions. *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1985), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Proctor v. LeClaire*, 846 F.3d 597, 610–11 (2d Cir. 2017); *see H'Shaka v. O'Gorman*, 758 F. App'x 196, 199 (2d Cir. 2019) (summary order).

We express no view as to whether Walker should have been transferred to the general population at some point during that five-year period. But Walker was entitled to meaningful process assessing that question. And, construing the record evidence in the light most favorable to Walker, as we must at the summary judgment stage, we conclude that a reasonable jury assessing the record could find that the reviews that his continued solitary confinement received were not constitutionally meaningful.[1]

Accordingly, we **VACATE** the district court's judgment and **REMAND** the case for proceedings consistent with this opinion.

## SUMMARY

Tyrone Walker has spent more than nineteen years in solitary confinement in New York prisons. His incarceration began in 1994, after he was convicted of

---

[1] We thank appointed counsel for their extensive efforts in this case and their able representation of Walker.

committing three brutal crimes: two murders, and an armed robbery. In 2000, after six years in the custody of New York's Department of Corrections and Community Supervision ("DOCCS"),[2] Walker committed another egregiously violent crime, attacking the Deputy Superintendent of Security ("DSS") with an ice pick and a knife in the Green Haven prison yard. The DSS was seriously injured and other correctional officers were also injured in the assault. As punishment for the brutal attack that he carried out in the prison, DOCCS imposed on Walker an approximately fourteen-year term of "Disciplinary Segregation." Walker served that term, from 2000-2014, under solitary confinement conditions in the Special Housing Units (the "SHUs") of state prison facilities.

When Walker's term of punitive Disciplinary Segregation ended in 2014, DOCCS did not release him from the SHU. Instead, it designated him for "Administrative Segregation" ("Ad Seg")—an indeterminate status that is based on predicted behavior. To designate a person for Ad Seg, DOCCS officials must first decide that returning that person to the general prison population would pose a risk to the safety and security of the facility. *See* 7 N.Y.C.R.R. § 301.4(b).

After making that determination and designating Walker for Ad Seg, DOCCS transferred him to Upstate Correctional Facility ("Upstate"), a specialized prison where SHU cells made up 80% of the facility's housing. When the record in this case closed in 2019—nineteen years after the prison yard attack—Walker was still there. Defendants advise the Court that he remained in the SHU until March 2022, around the time new statutory provisions governing the use of segregated housing came into effect in New

---

[2] Before April 1, 2011, New York's corrections agency was called the New York State Department of Correctional Services. On that date, new legislation merged the agency with the New York State Division of Parole to form the New York State Department of Corrections and Community Supervision. *See People v. Brown*, 25 N.Y.3d 247, 249 (2015) (discussing the merger).

York state detention facilities; Walker was then transferred to a step-down facility. *See* DOCCS Br. 22.[3]

The physical and psychological hardship faced by individuals in solitary confinement has regularly been recognized by the courts and by international bodies. The "[y]ears on end of near-total isolation exact a terrible price" and, in many cases, induce severe psychiatric symptoms. *Davis v. Ayala*, 576 U.S. 257, 286–90 (2015) (Kennedy, *J.*, concurring). Solitary confinement can also cause physical harm, both due to "high rates of suicide and self-mutilation" and "the lack of opportunity for free movement" causing "more general physical deterioration." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 567–68 (3d Cir. 2017) (footnotes omitted). State legislatures, the ABA, and international organizations have recognized these harms and worked to prevent overuse of the practice. *See, e.g.*, S. S2836, 2021–2022 Leg. Reg. Sess. (N.Y. 2021); Am. Bar Assoc., *Treatment of Prisoners*, ABA Standards for Crim. J. Third Edition, § 23-3.8 (2011); United Nations Gen. Assembly, *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading punishment or treatment*, U.N. Doc. A/66/268, ¶ 70 (Aug. 5, 2011).

In view of these documented extreme effects, courts have regularly held that the Due Process Clause protects incarcerated individuals against the unjustified use of solitary confinement—particularly when its stated purpose is prevention, not punishment. *Hewitt*, 459 U.S. at 477 n.9; *Proctor*, 846 F.3d at 610–11; *see H'Shaka*, 758 F. App'x at 199. Due process requires prison officials to undertake "periodic review[s]" to determine whether a person designated in Ad Seg "remains a security risk." *Hewitt*, 459

---

[3] Public records show that Walker is now housed in another New York State prison, Clinton Correctional Facility. *See* Incarcerated Lookup, DOCCS, https://nysdoccslookup.doccs.ny.gov/ (last visited July 24, 2025) (Search results for "Tyrone Walker").

U.S. at 477 n.9. Those reviews must be "meaningful"—that is, their results must not be pre-ordained; in each, prison officials must actually attempt to assess and then consider the individual's current threat level and any changes in their behavior. *Proctor*, 846 F.3d at 610–11. The ultimate determination whether to continue imposing solitary conditions or to return a person to the main prison population must be based on considerations of present and future institutional safety and security, not on a desire to continue to punish the person for past misconduct. *Id.*

During Walker's five years of Ad Seg in the Upstate SHU, which began in 2014, DOCCS officials completed forty-six reviews of his Ad Seg status, each following a three-tiered process described further below. On each occasion from 2014 through 2019, the review report recited the violent assaults that Walker committed in 1993 and 2000 and various prison-rule infractions in those and intervening years before concluding that Walker still posed a risk to the safety and security of the facility and that he could not be safely returned to the general prison population. Those may have been reasonable determinations; we owe them considerable deference. Under *Hewitt* and *Proctor*, however, the relevant inquiry is not whether DOCCS's conclusions were reasonable; it is whether the process used to reach those conclusions was constitutionally meaningful.

Walker maintains that it was not. In 2017, he filed this action under 42 U.S.C. § 1983, alleging that certain DOCCS officials ("Defendants") did not conduct constitutionally adequate reviews of his Ad Seg confinement over the five years from 2014 through 2019.[4] When he filed his complaint and at all times until this appeal,

---

[4] His operative complaint named the following individuals as defendants: Joseph Bellnier, former Deputy Commissioner for Correctional Facilities for DOCCS; James A. O'Gorman, subsequent Deputy Commissioner for Correctional Facilities for DOCCS; Donald Uhler, Superintendent at Upstate; Paul P. Woodruff, Deputy Superintendent of Security at Upstate;

Walker proceeded *pro se*. He identified several aspects of the review process that, in his view, raised serious questions about whether Defendants performed meaningful review in determining—forty-six times in five straight years—that he must remain in solitary confinement.

Walker does not contest that he was horribly violent in his teens and until he was thirty, when he committed the crimes described above and others. And he apparently acknowledges that the assault he committed in his early thirties, in 2000, was especially egregious because he was incarcerated at the time.

But Walker is now in his late fifties. When the record in this case closed, he had been in prison for twenty-five years and in solitary confinement for nearly twenty. He had not been involved in any violent incident since the 2000 attack that led to his years of Disciplinary Segregation. Although his early time in Disciplinary Segregation was punctuated by nonviolent misbehavior, his record became more favorable over time and he incurred no misbehavior reports from 2012 to 2014. In the five years he spent at Upstate, beginning in 2014, he incurred only one misbehavior report—for cursing at a correctional officer who directed him to end a phone conversation with his daughter. In reviewing his behavior over the five years from 2014 to 2019, DOCCS officials consistently described him as "appropriate," and reported that he caused "no issues." Yet in every review since 2014, DOCCS officials used the same words in their assessments and offered no analysis of Walker's current possible inclination to violence, concluding—to all appearances, inevitably—that he posed a threat to the safety and security of the facility and must remain in Ad Seg.

---

Joanne Fitchette, Deputy Superintendent of Programs at Upstate; and Melissa A. Cook, Offender Rehabilitator Coordinator at Upstate.

Walker argues that these observations, along with other aspects of his reviews, raise triable issues of fact material to the question whether his reviews were constitutionally meaningful. For example, as we describe below, his reviews appeared to give no weight at all to—or left unmentioned—his recent years-long stretches of appropriate behavior. And in a version of the "circular" reasoning that we found suspect in *Proctor*, 846 F.3d at 614, Defendants sometimes ascribed his positive behavior to his continued solitary confinement and used the long-past crimes to fortify their prediction of violence if he were returned to the general population. The reviewers also found that Walker had on occasion made statements that, in their perhaps reasonable view, reflected a sense of entitlement, or a lack of remorse, and relied on those statements in their analysis. But the statements, he argues, were misinterpreted; he points to alternative, innocuous explanations available on the face of the reviews. He complains that similarly Defendants gave no response at all to his repeated requests for guidance about how he could show he deserved trust and work towards demonstrating that he would not become violent if he were returned to the general prison population to serve the rest of his life sentence.

Walker also asserts that delays in the review process deprived him of the opportunity to correct misunderstandings or to modify his behavior in response to statements made in the reviews. He points to evidence that Defendants repeatedly failed to complete his reviews in a timely fashion and neglected to provide him a copy of his reviews for earlier periods before later review periods began. In one instance, as described below, he received all at once the copies he was due of nine long-ago-completed reviews—suggesting, he argues, that the whole review process reflected mere rubber-stamped paper processing. Other reviews were not timely completed, and on two occasions the Deputy Commissioner completed an earlier review *after* he had already decided that Walker should remain in Ad Seg during a later period.

The United States District Court for the Northern District of New York (Suddaby, *J.*) granted summary judgment to all Defendants, ruling that Walker demonstrated no genuine issues of material fact for a jury's consideration regarding the constitutional meaningfulness of Walker's reviews. *Walker v. Bellnier*, No. 9-17-cv-1008, 2021 WL 855842, at *3 (N.D.N.Y. Mar. 8, 2021). In the alternative, the court decided, all Defendants were entitled to qualified immunity because in the review process no clearly established right of Walker's had been violated. *Id.*

On *de novo* review, we conclude otherwise. In our view, Walker has raised genuine issues of material fact as to whether his Ad Seg reviews were constitutionally meaningful and Defendants are not entitled to judgment as a matter of law. Although the judgment is a close one, the peculiarities of the reviews that Walker received, when viewed together through the lenses of *Hewitt* and *Proctor* and in light of now-widespread recognition of the particular harshness of solitary confinement create genuine disputes of material fact that a jury must decide.[5]

Relatedly, we decide that it is premature at this stage to determine that Defendants are entitled to qualified immunity. Defendants do not seriously dispute that *Hewitt* and *Proctor* clearly established Walker's right to meaningful review. Instead, they argue that their review process was meaningful and thus did not violate that right. For the reasons already described, we disagree. True, forty-six reviews were conducted and reports issued; as *Proctor* instructs, however, their number and the fact that a three-layer process led to their bottom line do not suffice to put the question of constitutional

---

[5] We emphasize that our holding is based on the totality of the circumstances that Walker describes. We take no position as to whether some of the facts here, viewed in isolation, would raise a triable issue as to the degree of process Walker received. So—contrary to the dissent's characterization—we do not hold that it is categorically "suspect" for reviewing officials, after engaging in a review process that considers and evaluates current circumstances, to conclude that they should adhere to their initial safety determination. *See* Dissent at 3.

meaningfulness to rest for a reasonable jury. Walker's evidence of virtually identical reviews, *e.g.*, App'x 760, App'x 755, with reasoning that failed even to acknowledge that his ongoing good behavior might bear on the decision to retain him in or release him from Ad Seg, and which the Deputy Commissioner may have "rubber stamped"—as well as his record of five years in Ad Seg (and nineteen *in toto*) without a violent episode—raised genuine issues of material fact that the district court was not entitled to resolve on summary judgment.

We emphasize that our focus lies on the vindication of Walker's procedural, not substantive, due process rights. We do not hold or suggest that, to rebut claims of constitutionally inadequate procedure, prison officials must simply at some point return Walker or any individual to the general prison population. Those officials do, however, need to provide more than rote responses; to conduct timely reviews; to allow the individual to participate in the process, under the prison's own regulations, by timely providing their reviews to him; to give a coherent explanation of why his favorable record is not meaningful; and to address his developing record over time. In Walker's case, the evidence suggests that a reasonable juror could conclude that officials at Upstate did not do so.

Defendants advise the Court that in March 2022, Walker was released from the SHU and transferred out of Ad Seg to a step-down facility. *See* DOCCS Br. 22. Public records show that he has since been transferred to another New York prison. We repeat, however, that this case is about process, not about outcomes. A jury should decide on a complete record whether Walker received that constitutionally required process over the five years that he was kept in solitary as a purely preventative measure.

Accordingly, we **VACATE** the district court's judgment and **REMAND** the case for further proceedings.

10

## I.  Prison procedures and legal background

### A.  Solitary confinement in the DOCCS System

In New York state prisons, incarcerated individuals—including those convicted of violent crimes—are presumptively housed in the general prison population. *See* App'x 545–46. In certain circumstances, however, DOCCS officials are authorized to remove an individual from the general prison population and to house that person in solitary confinement: the SHU. *See generally* N.Y. Corr. L. § 137(6) (effective July 2011) (authorizing superintendents to remove individuals from the general population "for such period as may be necessary for maintenance of order or discipline").

Most individuals serving time in the SHU are there because, while incarcerated, they have been found guilty of committing an act of misconduct in the prison. Persons assigned to the SHU for such misconduct are in what DOCCS calls Disciplinary Segregation status. Disciplinary Segregation terms are thus imposed from a retrospective vantage—prison officials look back at misconduct and mete out a suitable punishment. 7 N.Y.C.R.R. §§ 270.2, 270.3, 301.2.[7]

An order committing a person to Administrative Segregation ("Ad Seg"), on the other hand, is both prospective and indeterminate. It sets no end date, and its premise is

---

[6] We draw this factual statement from the documents in the record and the parties' statements of material facts. *See* Fed. R. Civ. P. 56(c). We present the evidence in the light most favorable to Walker, as required when evaluating whether Defendants are entitled to summary judgment. *Washington v. Napolitano*, 29 F.4th 93, 99 (2d Cir. 2022).

[7] The summary judgment record in this case closed in July 2019. Certain relevant DOCCS Directives and state regulations were amended, however, in 2020, and repealed in 2022; in addition, the HALT Act was enacted in 2021 and made effective in 2022. *See infra* at 36. Unless otherwise noted, citations to DOCCS Directives and state regulations refer to the versions in effect from 2014–2019, the period of Walker's challenged confinement in Ad Seg.

not past misconduct but the forward-looking assessment of prison officials that an individual's "presence in [the] general population would pose a threat to the safety and security of the facility." *Id.* § 301.4(b); *see also Proctor*, 846 F.3d at 611. Assignment to Ad Seg is permitted as long as, but only as long as, the designated individual "*remains* a security risk." *Proctor*, 846 F.3d at 611 (quoting *Hewitt*, 459 U.S. at 477 n.9). By regulation, individuals designated for Ad Seg serve their time in the same SHU, subject to the same solitary confinement conditions, as those who have completed a thirty-day period of satisfactory adjustment in Disciplinary Segregation. *See* 7 N.Y.C.R.R. § 301.4(c).

Solitary confinement deprives the confined person of nearly all environmental stimuli. *Peoples v. Annucci*, 180 F. Supp. 3d 294, 298 (S.D.N.Y. 2016) (describing solitary confinement in New York state prisons). Individuals in solitary confinement spend "virtually all of their time" alone, in a concrete cell roughly the size of a parking space. *Id.*; *see also Davis*, 576 U.S. at 287 (Kennedy, *J.*, concurring).[8] In New York, their cells typically have solid doors with "[f]eed-up hatch[es]" for DOCCS employees to deliver meals, which the individuals eat alone. *See* App'x 108, 116, 119, 311. During their daily hour or so of recreation time, individuals in the SHU may exercise—again, alone—in their empty "rec cage," an "enclosed pen" that is only slightly larger than their SHU cell. App'x 439; *Peoples*, 180 F. Supp. 3d at 298. They are denied the "various privileges available to general population prisoners, such as the opportunity to work" and to participate in out-of-cell programming or schooling. *Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000).

---

[8] In some New York State SHUs, two individuals may be housed together, subject to the same strict deprivations. *See* Dept. of Corrs. and Comm. Supervision, *Upstate Correctional Facility Final PREA Audit Report*, 4 (Nov. 22, 2015); *Ortiz v. McBride*, 380 F.3d 649, 652 (2d Cir. 2004) (detailing "double-bunk[ing]" in the SHU at Fishkill Correctional Facility).

While in the SHU, individuals have strictly limited access to personal property, reading material, cleaning supplies, packages, phone calls, visits, and even showers. App'x 105–13, 122.[9] They may not visit the prison legal library; the facility's "inmate advisors" and "law clerks" may not visit them in the SHU; and they are limited to borrowing two items of "legal material" at a time (even these, they must return within 24 hours). App'x 111. They are permitted to make one, fifteen-minute phone call per month, and non-legal visits are permitted only once per week. App'x 122. Showers are limited to three per week. *Id.* Through good behavior, individuals in the SHU may "earn" certain limited mitigations of these conditions, such as, for example, a fourth shower each week; authorization to buy items like legal paper and deodorant from the prison commissary; and the ability to wear sweatpants, provided they personally own a pair. App'x 107, 122, 1010; 7 N.Y.C.R.R. § 303.3.

The negative effects of solitary confinement on a person's mental, physical, and emotional state are well-documented and can be devastating. *See Davis*, 576 U.S. at 286–90 (Kennedy, *J.*, concurring) (collecting sources); *see also Peoples*, 180 F. Supp. 3d at 299 ("the literature is virtually unanimous in its conclusion: prolonged supermax solitary confinement can and does lead to significant psychological harm" (internal quotation marks omitted)). As of 2014, individuals in solitary confinement in the New York prison system were "approximately seven times more likely to harm themselves than prisoners in the general population." *Peoples*, 180 F. Supp. 3d at 299 (citing Homer Venters, et al., *Solitary Confinement and Risk of Self–Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (Mar. 2014)); *see also* Amnesty Int'l, *Entombed: Isolation in the US Federal*

---

[9] We draw this description from DOCCS Directive 4933 (last revised Aug. 16, 2018); *see* App'x 98–122. These restrictions were in effect during a significant portion of Walker's Ad Seg term, and the record does not reflect how, if at all, they changed over time.

*Prison System* (2014); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006).

The effects are so severe that the United Nations Special Rapporteur on Torture concluded that "the use of solitary confinement itself can amount to . . . torture as defined in article 1 of the Convention against Torture[.]" United Nations Gen. Assembly, *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading punishment or treatment*, U.N. Doc. A/66/268, ¶ 70 (Aug. 5, 2011).[10] The ABA and international organizations have further condemned its overuse.[11] And in 2016, in the landmark case of *Peoples v. Annucci*, 180 F. Supp. 3d 294 (S.D.N.Y. 2016), New York's executive branch agreed to a settlement that modified the conditions of solitary confinement that the State would impose.

**B.  Ad Seg review procedures**

New York's Ad Seg system is governed by state statutes codified in Title 7 of the New York Compilation of Codes, Rules & Regulations, the title that generally governs DOCCS operations. At all times relevant here, the law permitted DOCCS officials to designate an incarcerated person for Ad Seg using the following process.[12]

---

[10] Other reports document the negative effects of solitary confinement on the staff assigned to SHU units and on the family members of those incarcerated there. *See, e.g.*, Correctional Ass'n of N.Y., *Solitary at Southport: A 2017 Report based upon the Correctional Association's Visits, Data Analysis, & First-Hand Accounts of the Torture of Solitary Confinement from One of New York's Supermax Prisons* (2017).

[11] *See, e.g.*, Am. Bar Assoc., *Treatment of Prisoners*, ABA Standards for Crim. J. Third Edition, § 23-3.8 (2011); United Nations Gen. Assembly, *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading punishment or treatment*, U.N. Doc. A/66/268, ¶ 70 (Aug. 5, 2011); *Peoples*, 180 F. Supp. 3d at 299–300 (collecting international sources).

[12] The process has since changed to require a shortened timeline and limit the total number of days a person may spend in any segregated housing, to comply with the HALT Act. Today, the

First, a DOCCS employee who "ascertained . . . facts or circumstances" suggesting that the person's "presence in [the] general population would pose a threat to the safety and security of the facility" could submit a recommendation that the person be placed in Ad Seg. 7 N.Y.C.R.R. §§ 301.4(a)–(b). The person would then be admitted to Ad Seg and placed in the SHU. *Id.* § 301.4(b).

Then, within fourteen days of the person's admission to the SHU, DOCCS would conduct a hearing and issue a written disposition "set[ting] forth specific reasons why administrative segregation [was] warranted." *Id.* § 301.4(a). If such a disposition was made, the individual would remain in the SHU, in Ad Seg status; if not, the person would be returned to the general prison population.

For individuals admitted to Ad Seg through this process, like Walker, DOCCS periodically reviewed their Ad Seg designation. *Id.* § 301.4(d). The applicable process consisted of three steps. *First*, a three-member Facility Committee based at the prison in question would examine the person's institutional record and prepare a report based on that information. The report was required to set forth:

> (i) reasons why the inmate was initially determined to be appropriate for administrative segregation;
>
> (ii) information on the inmate's subsequent behavior and attitude; and

---

regulations provide for a hearing within "seven days after the initial determination" and reviews "every seven days for the first two months and at least every 30 days thereafter." 7 N.Y.C.R.R. §§ 301.4(b)–(c) (2023). They further state that "[n]o incarcerated individual may be placed in segregated confinement . . . for . . . more than 15 consecutive days or 20 total days in any 60-day period, except where a specific act constitutes a violent felony act, if occurring more than once in a 60-day period, the incarcerated individual may serve an additional 15 consecutive days" with at least 15 days in a rehabilitation unit in between each segregation placement. *Id.* § 301.1 (2023); *see also id.* § 301.4(e) ("Incarcerated individuals in administrative segregation shall either be released from segregated confinement or diverted to a residential rehabilitation unit, or a step-down unit no later than the time limitations set forth in section 301.1.").

(iii) any other factors that [the members of the Facility Committee] believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

*Id.* § 301.4(d)(1)(i)–(iii).

*Second*, the Facility Committee provided its report, along with "any written statement received from the inmate," to the Central Office Committee. *Id.* § 301.4(d)(2). The Central Office Committee was based in Albany and made up of three officials drawn from the greater DOCCS staff. *Id.* §§ 301.4(d)(2)–(3); App'x 552.[13] The Central Office Committee then prepared its own written report and arrived at its own recommendation about whether the individual should remain in Ad Seg. 7 N.Y.C.R.R. § 301.4(d)(3).

*Third*, the Central Office Committee transmitted both reports to the Deputy Commissioner for Correctional Facilities. The Deputy Commissioner made the final determination as to whether the individual would remain in Ad Seg. *Id.*

Once a final determination was made, the Deputy Commissioner was bound to provide the designated individual "notice" of the decision and to "state[] the reason(s) for the determination." *Id.* § 301.4(d)(4). The notice was also required by regulation to include a statement that explained that the designated individual had an opportunity to respond to his reviews in writing. *Id.*[14] DOCCS followed this process to review its Ad

_____

[13] The governing statute provides for referral of the Facility Committee report, along with any written statement by the inmate, to the superintendent of the facility at issue, who then decides whether to retain the individual in Ad Seg. 7 N.Y.C.R.R. § 301.4(d)(2). But the statute allows the deputy commissioner for correctional facilities to notify the superintendent that certain individuals in Ad Seg are to receive central office review. *Id.* § 301.4(d)(3). Walker was one of those individuals. *See* App'x 1051–52, 1054.

[14] The required statement reads:

Seg determinations every 60 days until July 2017, when it began to conduct its reviews on a 30-day cycle. *Id.* § 301.4(d); App'x 553.

## C. Due Process requirements

In this Circuit, incarcerated individuals have a liberty interest in avoiding long-term solitary confinement, on the rationale that such confinement constitutes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Colon*, 215 F.3d at 228–29 (quoting *Sandin*, 515 U.S. at 484).[15] Some of these hardships, we have described above; they vary in their particulars from facility to facility and from State to State. *E.g.* Jaquelyn L. Jahn et al., *Clustering of Health Burdens in Solitary Confinement: A Mixed-Methods Approach*, 2 Qualitative Rsch. Health. 1, 1–2 (2022).

Recognizing this liberty interest, the Due Process Clause requires prison administrators to conduct periodic reviews to ensure that any individual held in solitary confinement as a preventive, administrative measure "remains a security risk." *Hewitt*, 459 U.S. at 477 n.9. Like all constitutionally required process, such reviews must

---

> A determination has been made to continue your administrative segregation status for the reason(s) stated in this notice. Prior to your next 60-day review, you may write to the superintendent or designee to make a statement regarding the need for continued administrative segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

[15] *Colon* recognized a liberty interest in avoiding a 305-day term of incarceration in the SHU. 215 F.3d at 229; *see also Fludd v. Fischer*, 568 F. App'x 70, 73 & n.1 (2d Cir. 2014) (summary order) (treating length of SHU term, which was "substantially longer than 305 days" as sufficient, without more, to establish a liberty interest). When a person is held in the SHU for a shorter period, we generally evaluate both the duration of the person's SHU term and the conditions imposed at the SHU to determine whether the SHU term implicated a liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004).

17

occur at a meaningful time and be conducted in a meaningful manner. *Proctor*, 846 F.3d at 609 (citing *Armstrong*, 380 U.S. at 552); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion).

Courts evaluating whether prison officials provided meaningful Ad Seg reviews must give appropriate weight to the interests of the public and of prison officials in maintaining a safe and secure facility. *See* 7 N.Y.C.R.R. § 301.4(b). The due process analysis must also afford the officials charged with that responsibility significant latitude in "adopt[ing] and execut[ing] policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Proctor*, 846 F.3d at 610 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *Proctor*, we balanced those interests against the interest of an incarcerated person in "avoiding an indefinite Ad Seg term," an interest that we described as "also weighty." *Id.* at 610. We determined that meaningful review of an Ad Seg determination requires that officials address two questions: first, whether "the inmate's continued Ad Seg confinement is justified" by considerations of "institutional safety and security," a question officials must "actually evaluate," and second, whether that justification "exists at the time of the review or will exist in the future." *Id.* at 610–11.[16] As we commented in *Proctor*, "SHU confinement that began for proper Ad Seg purposes may not morph into confinement that persists for improper purposes." *Id.* at 611. We warned

---

[16] Until 2022, prison officials in New York were authorized by regulation to hold individuals in the SHU "for any . . . reason, with the approval of the deputy commissioner for facility operations," including where a related disciplinary investigation was pending or where the person's own safety would have been at risk in the general prison population. 7 N.Y.C.R.R. §§ 301.5, 301.6, 301.7. State regulations restricted the use of *Ad Seg*, however, to considerations of the safety and security of the facility. *Id.* § 301.4(b). Facility safety and security considerations are the only justifications at issue here.

that "[t]he state may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions." *Id.*

With regard to the substance of the review, we cautioned also that "[i]t is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows." *Id.* at 610. Review with a pre-determined outcome, we stressed, is "tantamount to no review at all." *Id.*

We further emphasized that reviewers must "consider new relevant evidence as it becomes available," and "take into account prison conditions and inmate behavior as they change over time." *Id.* at 611. Officials must remember that the question is not "whether the confined inmate *was* a threat to the facility when he was confined initially; it is whether the inmate *remains* a security risk on the date of the periodic review." *Id.* (internal quotation marks omitted).

In reaching what can be a difficult predictive determination, reviewers are not "barred from according significant weight to events that occurred in the past," we allowed, nor need they treat recent behavior as "categorically . . . more salient." *Id.* Rather, prison officials "must look to the inmate's present and future behavior and consider new events *to some degree* to ensure that prison officials do not use past events alone to justify indefinite confinement." *Id.* (emphasis added).

## II. Walker's background in the criminal justice system

### A. Walker's criminal conduct

#### i. *The criminal conduct leading to Walker's incarceration*

Walker entered DOCCS custody in 1994, following his convictions for three violent crimes committed by him in 1993. On February 18 of that year, he murdered a rival drug dealer, Michael Monsour, while attempting to rob Monsour of cocaine and

drug proceeds in Cragsmoor, New York. Five days later, on February 23, he shot at two different people while attempting to rob them—the first, in Manhattan, was a woman named Bonnie Bear, who died of her injuries eight days later; the second, in Brooklyn, was a man named Herbert Muskin, who was not physically injured.

For the February 23 crimes, the state court sentenced Walker to a minimum of thirty-two and one-half years' incarceration: a term of seven and one-half to fifteen years for robbery and criminal possession of a weapon in connection with the Muskin robbery, and a consecutive twenty-five years to life for murder, robbery, and criminal possession of a weapon in connection with the Bear killing. For the February 18 murder of Monsour, Walker was prosecuted in federal court in the Northern District of New York, where the prosecution sought the death penalty in a two-phase trial process.[17] In the end, the jury failed to reach a unanimous decision to impose the death penalty, and Walker received a federal sentence of life imprisonment without the possibility of parole.

In the early 1990s—including while these prosecutions were ongoing—Walker continued to act violently. In 1992, he participated in the assault of another incarcerated man in the Sullivan County jail, who was beaten and stabbed approximately eighteen times. And when he was awaiting his federal prosecution in 1995 he allegedly attempted to escape from custody; smuggled a razor blade into court; attempted to hire

---

[17] In the penalty phase of his federal trial, the jury made findings about other crimes that would be relevant to the sentence he received. *See* Penalty Phase Special Findings *United States v. Walker et al.*, 3-94-CR-328, ECF No. 605 (N.D.N.Y. Feb. 28, 1996). These largely concerned assaults and other crimes that he committed in the early 1990s, including that earlier, in 1987, he had "directly participated in the killing" of another individual, one Philip Slutsky, in Ellenville, NY. *Id.* at 5. With one member disagreeing, the remaining jury members are reported to have recommended the death penalty. *See* Dissent at 5 n.2 (citing John Caher, *Outraged Jurors Say Life Term Isn't Enough*, Times Union (July 23, 1996)).

a hitman to kill a government witness; and assaulted a deputy in an attempt to steal keys.[18]

> ii.      *Walker's early years of incarceration (1994–2000)*

The violence of Walker's 1993 offenses meant that he would be incarcerated in a maximum-security state facility. Nonetheless, consistent with standard DOCCS practice, he was held in the general population at that maximum-security facility. He was first incarcerated at Downstate Correctional Facility, in Fishkill, New York, and then at Green Haven Correctional Facility, in Stormville, New York.

During his first six years of incarceration, from 1994 through summer 2000, Walker incurred twelve Tier II misbehavior reports.[19] In these twelve incidents, the reports cited Walker for the following infractions: "utensils," "out of place," refusing a "direct order," "unauthorized call," "mess[ ]hall" violation, "smuggling," creating a "disturb[ance]," "contraband," "no ID card," "loss/damage" to property, "movement [violation]," "harassment," "search/frisk," "hearing disp[osition]" compliance, and, on one occasion in 2000, "threats" and a "delay [of] count." App'x 570–71. He incurred one Tier III misbehavior report, in 1996, for possessing an unspecified "weapon" and "altered item." App'x 571.

---

[18] These allegations are detailed in a letter that was sent by the Office of the United States Attorney for the Northern District of New York to the Bureau of Prisons in 1996. App'x 613–14. Walker was apparently not prosecuted for these offenses, and during the penalty phase of his federal trial, the jury was unable to reach a unanimous verdict regarding his alleged attempt to hire a hitman. Penalty Phase Special Findings, *United States v. Walker et al.*, 3-94-CR-328, ECF No. 605 at 5 (N.D.N.Y. Feb. 28, 1996).

[19] Misbehavior in New York State prisons is managed on a "Tier" system, with Tier I the least serious, and Tier III the most. *See* 7 N.Y.C.R.R. § 270.2. Correctional officers apparently have broad discretion to assign tier levels to most infractions. *See id.*; Corr. Assoc. of N.Y., *Lockdown New York: Disciplinary Confinement in New York State Prisons*, 15 (Oct. 2003). Once a tier level is assigned, punishments are set accordingly. *See* 7 N.Y.C.R.R. § 270.3.

Then, on September 27, 2000, Walker committed a grievous Tier III violation by attacking the Deputy Superintendent of Security ("DSS") in the prison recreation yard. Walker obtained an ice pick and a knife in the yard, secured them to his hands with leather thongs, and attacked the DSS, stabbing him several times and seriously injuring him. During the attack, he also stabbed another correctional officer, and he punched a third while that officer was taking Walker to the SHU.

Appropriately, these attacks carried serious consequences. Charged by the State with attempted murder, he pled guilty and was sentenced to an additional fifteen years to life of imprisonment, bringing his overall minimum state sentence to forty-seven and one-half years. The attacks led to serious consequences for Walker within the prison system, as well: for the murder attempt, DOCCS ordered Walker to serve about fourteen years of "Disciplinary Segregation" in the SHU. He ultimately spent approximately thirteen years in Disciplinary Segregation pursuant to this order.

> iii.    *Walker's thirteen years in disciplinary segregation (2000–2014)*

Walker's early years in Disciplinary Segregation were punctuated by continued misbehavior, generally at the Tier II level. Walker admits that, during those years, he maintained a "[Y]ou come at me and I come back at you" attitude, and that he addressed problems through confrontation or insubordination. App'x 1076. During Walker's approximately thirteen years of Disciplinary Segregation, from late 2000 through 2014, he incurred four Tier II misbehavior reports[20] and seven Tier III misbehavior reports.[21] These included one weapon-related infraction, which apparently

---

[20] The Tier II offenses were: (1) harassment, (2) creating a disturbance and interference, (3) creating a disturbance, interference, threats, and harassment, and (4) altered item and unauthorized exchange. App'x 569.

[21] The Tier III offenses were (1) smuggling, (2) demonstration, creating a disturbance, and refusing a direct order, (3) bribery/extortion, unauthorized valuable, and smuggling,

occurred in 2011, when officers discovered Walker in possession of a small piece of plexiglass.[22] None of these incidents appears to have involved violence, and Defendants do not contend otherwise.

As time passed, Walker says, he "learned to address [his] grievances through the litigation process," App'x 1026. He achieved some success by doing so. *See Walker v. Fischer*, 923 N.Y.S.2d 912, 912 (3d Dept. 2011) (describing DOCCS's administrative reversal and expungement of misbehavior report regarding violation of "facility correspondence procedures"); *see also* App'x 93, 425. According to Walker, learning to use the grievance and litigation processes provided—and reflected—a "changed approach to deal with [his] problems." App'x 1026; *see also* App'x 422–23.

In the final two years of his Disciplinary Segregation, from March 2012 until January 2014, Walker incurred no misbehavior reports. Instead, he compiled a favorable behavior record that earned him several "time cuts" and reduced his Disciplinary Segregation sentence. App'x 123–32. When he completed his term of punishment, he had spent about thirteen years in the SHU.

In January 2014—the day before Walker's term of Disciplinary Segregation was to expire—a DOCCS employee recommended that Walker remain in solitary, in Ad Seg status. In support, the employee's written recommendation reviewed Walker's 1993 crimes of conviction; his attempted escape and assaults pending trial in the early 1990s;

---

(4) refusing a direct order, (5) drug use, (6) possessing a weapon and providing false information, and (7) having property in an unauthorized location and smuggling. App'x 568–69. The bribery/extortion and smuggling incident is detailed in an Article 78 proceeding and appeal, and appears to have involved Walker offering a corrections officer $ 20 to get him cigarettes. *Walker v. Fischer*, 896 N.Y.S.2d 522, 523 (3d Dept. 2010).

[22] The piece of plexiglass measured 1 ¾" by ¾"; DOCCS described it as a "mirror." App'x 189, 192. Walker explains that he used it to look out of his cell, and he asserts that it was not a weapon. *See id.*; App'x 82, 183.

the brutal attack that he carried out fourteen years earlier, in 2000; and the list of his disciplinary infractions over the nineteen total years of his incarceration. App'x 596–97. The employee also highlighted a sentence that Walker had written four years earlier in an intercepted letter to a romantic partner. App'x 597. In the 2010 letter, Walker advised that he would discipline the recipient's teenage sons if they were "acting like kids" around him, saying, "On another note, my abilities is serious I can fight extremely well, I'm considered one of the most dangerous prisoners in the state because I don't play if I do something. I wouldn't hurt none of your sons bad, but I'll let them know they can't mess with me." App'x 624.

Walker challenged the recommended designation. But, after a hearing, DOCCS determined to re-commit him to the SHU, this time in Ad Seg status. *See* App'x 647.[23]

The day after his Ad Seg designation was re-confirmed, Walker stopped a correctional officer who was conducting rounds and handed over a narrow, crescent-shaped piece of metal that was about 1¼ inches long and 1/8 inch wide. *See* App'x 657. Walker told the officer he had found the piece of metal on the floor while cleaning his cell and said that there "should be an award for his good behavior." *Id.* Instead, the officer, who perceived the item to have been "sharpen[ed]," issued Walker a Tier III misbehavior report for "bribery or extortion," "weapon," "altered item," and "property in unauth[orized] area." App'x 653, 659.

> iv.        *Walker's five years in Ad Seg (2014–2019), before the record closed*

Soon after, Walker was moved to Upstate Correctional Facility and placed in that facility's SHU, where he remained until the record in this case closed, five years later. During those five years, he received only one additional misbehavior report. That

---

[23] Walker makes no challenge to this decision.

report concerned an incident that occurred on June 1, 2017, when Defendant Cook directed Walker to end his phone conversation with his daughter. Walker refused and cursed at Defendant Cook. App'x 717, 846.

In connection with the incident, the Central Office Committee later noted that "[W]alker anticipates phone calls with his daughter and looks forward to them." App'x 846. It advised that Walker "is no longer assigned to [Defendant Cook]," that "there have been no issues with the new [DOCCS employee] assigned," and that, "[b]esides the above incident," Walker's behavior had been "appropriate." *Id.*

Otherwise, Walker maintained an unblemished disciplinary record during those five years in the Upstate SHU. He passed his time by reading and writing, corresponding with his family, listening to basketball games, exercising when he was permitted to do so, playing chess, worshipping in accordance with his Muslim faith, and writing a book. *See, e.g.*, App'x 842, 853, 873, 895, 957, 974, 1009. Walker apparently earned all the incentives that were available to him under the prison's Pilot Incentive Program and, after that program was terminated in April 2017, he earned and maintained the privileges available under level III of the newly implemented Uniform Progressive Inmate Movement System ("PIMS").[24] He also completed the prison's Aggression Replacement Training program and continued to participate in its

---

[24] The Pilot Incentive Program and the "PIMS" program were each designed to provide a structured—but extremely limited—system of "privileges" for individuals in the SHU. *See* App'x 122 (describing PIMS privileges); 7 N.Y.C.R.R. § 255.03. As described in Section I, PIMS privileges included additional showers, access to additional personal property, and limited access to the prison commissary. *Id.* Walker apparently attained PIMS Level III status in October 2017, App'x 841, and remained at Level III until the record in this case closed in July 2019, App'x 738, even though the PIMS privilege chart shows that individuals progress to PIMS Level IV—the highest level—after 90 days of positive behavior, App'x 122. The record does not explain this discrepancy.

Academic Cell Study program, even though he had earned his high school diploma before he was incarcerated. App'x 746, 935.

## B. Walker's Ad Seg reviews

Between March 2014, when Walker was transferred to Upstate and placed in Ad Seg, and July 2019, when the record in this case closed, DOCCS officials reviewed Walker's Ad Seg status forty-six times.[25] Each time, they determined that Walker would pose "a risk to the safety and security of the facility" were he to be allowed to return to the general prison population. Accordingly, he was ordered to remain in solitary, in Ad Seg.

### i. Facility Committee reviews

Walker's Facility Committee was composed of three individuals from the Upstate facility where he was housed. Defendants Uhler, Woodruff, Fitchette, and Cook each served on the Facility Committee at various times during Walker's administrative segregation through 2019. App'x 1033, 1039, 1043, 1046.

Upstate's practice was to delegate responsibility for preparing Facility Committee reports to one person: the designated individual's Offender Rehabilitator Coordinator ("ORC"). App'x 1034, 552. To prepare a Facility Committee report, the ORC would meet with the individual and with other facility staff and collect information about the person's recent behavior, well-being, and general adjustment. *See id.* The other two members of the Facility Committee would then review the ORC's report and "express any questions or concerns that they had." App'x 1047. Defendant Cook sometimes served as Walker's ORC. App'x 1046.

---

[25] For ease of reading, record citations to these reports are set out in the margin.

According to Walker's deposition testimony, he met with ORC Cook and Defendant Woodruff not long after he was placed in Ad Seg. During this meeting, Defendant Woodruff purportedly told Walker that he "would never recommend [Walker] be released from ad-seg." App'x 485–87. Walker testified that Defendant Cook "expressed the same thing." App'x 487.

Consistent with these alleged statements, the Facility Committee did not, in fact, recommend that Walker be released from Ad Seg after any of its forty-six reviews. In the first section of each written review, entitled "Reasons why [the] inmate was initially determined to be appropriate for administrative segregation," the Facility Committee provided the same account of Walker's 2000 attack.[26] Then, in the second section, entitled "Information on the inmate's subsequent behavior and attitude," *see, e.g.*, App'x 736, it briefly recounted Walker's behavior in Ad Seg.[27] In that section, the Committee almost always described Walker as "appropriate" or "appropriate with all staff."[28] Sometimes, it described him as "polite and cooperative,"[29] or recounted that he was "quiet and causes no problems."[30]

---

[26] *See* App'x 736, 739, 749, 752, 755, 760, 767, 770, 777, 781, 787, 790, 795, 798, 801, 804, 808, 812, 815, 819, 833, 836, 839, 842, 845, 853, 858, 860, 863, 873, 895, 905, 913, 920, 928, 935, 942, 949, 957, 966, 974, 983, 992, 1009, 1017, 1024.

[27] Many of the Facility Committee reviews discussed Walker's disciplinary history in the "subsequent behavior" section of his reviews, even though all but two of his disciplinary incidents occurred *before* he was designated for Ad Seg. *See* App'x 863, 873, 905, 913, 920, 928, 935, 942, 949, 957, 966, 974, 983, 992, 1009, 1017, 1024.

[28] *See* App'x 812, 815, 819, 833, 836, 839, 842, 860, 863, 873, 895, 905, 913, 920, 928, 935, 942, 949, 957, 966, 974, 983, 992.

[29] App'x 812, 815, 819, 833, 836, 839, 842, 845, 853.

[30] App'x 928, 935.

Nevertheless, without grappling with these more current reports about Walker's conduct, each of the Facility Committee reviews in the record made the same recommendation, replicating the phrasing used in Walker's original Ad Seg disposition in 2014 in one of two formulations:

> Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

Or:

> Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correction facility an extreme risk to staff and inmates, as well as the safety and security of the facility.[31]

This recommendation appeared in the third section of the Facility Committee's report, which was entitled, "Other factors which may favor retaining the offender in or releasing the offender from administrative segregation." *See, e.g.*, App'x 863. Until August 2017, the Committee provided no additional information in the third section of its reports. Although the section's title promised to include factors that "may favor . . . releasing the offender" from Ad Seg, the Committee never mentioned any of Walker's positive behavior there. *See id.*

---

[31] App'x 736, 739, 749, 752, 755, 760, 767, 770, 777, 781, 787, 790, 795, 798, 801, 804, 808, 812, 815, 819, 833, 836, 839, 842, 845, 853, 858, 860, 863, 873, 895, 905, 913, 920, 928, 935, 942, 949, 957, 974, 983, 992, 1009, 1017, 1024; *see also* App'x 592–93 (Walker's original Ad Seg disposition). The relevant page of the report produced at App'x 966 is missing from the record. In a few instances, the Committee included the phrase "and good order" after "safety and security" in the first formulation. *See* App'x 842, 845, 853, 858, 860.

The sole change to the third section of the Facility Committee's report occurred in the Committee's August 2017 review. There, the Committee included a paragraph about Walker's violent past that had previously appeared in the report's "Background," historical section. *Compare* App'x 853, *with* App'x 845.[32] Thereafter, the Committee included this backward-looking paragraph in each of its recommendations.[33]

### ii. Central Office Committee reviews

Each of Walker's Facility Committee reviews was then sent to the Central Office Committee, which conducted a second layer of review. Walker was allowed to submit a written statement to the Central Office Committee, *see* 7 N.Y.C.R.R. § 301.4(d)(3), and he frequently exercised that option. In his submissions, he repeatedly asserted that he was no longer a threat because he had learned to resolve disagreements through litigation;

---

[32] The new paragraph read in full:

> Walker's past is marked with assaults and brutality showing a depraved indifference to human life. Walker entered DOC[C]S custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he had escape plots/attempts, and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

App'x 845.

[33] App'x 736, 739, 749, 752, 755, 760, 767, 770, 777, 781, 787, 790, 795, 798, 801, 804, 808, 812, 815, 819, 833, 836, 839, 842.

that he had not committed any violent acts in more than a decade; and that he regretted what he had done. *See, e.g.*, App'x 756–58, 779, 821–25, 1026.

In almost every submission, Walker requested that DOCCS advise him what he could do to demonstrate that he could safely be released from Ad Seg and returned to the general prison population. *See, e.g.*, App'x 875 (July 4, 2016: "I've posed the same question in every statement I've made . . . what can I do to be released from Administrative Segregation status?"); App'x 855[34] (June 2, 2017: "I'm asking because I always ask . . . What do I have to do in order to get out of Ad-Seg?"); App'x 824 (Dec. 27, 2017: "I'm doing everything I can to demonstrate I've changed and would like an opportunity to be reintegrated into population. I'm no different than any other prisoner . . . what can I do to be released from Ad Seg?").[35]

Sometimes, Walker's submissions also reflected frustration about his Ad Seg status, his conditions and needs for medical care, and the Central Office Committee's failure to address his submissions or to provide him with his reviews in a timely manner. *See, e.g.*, App'x 762–64 (Jan. 26, 2019: describing late reviews, medical issues, and interference with legal copies related to his grievances and lawsuits); App'x 772–75 (Dec. 25, 2018: describing medical concerns); App'x 783–84 (Nov. 1, 2018: expressing frustration over lack of response to his last three Ad Seg submissions and raising medical and dietary issues); App'x 792–93 (Sept. 6, 2018: asking Committee to respond to his prior submission, provide his completed reviews, and address issue regarding

---

[34] This letter from Walker appears erroneously dated "June 2, 2012." App'x 854. Because it follows his June 2017 reviews in the record before us and includes the statement, "[t]he last Ad Seg review I received is for 8-17-16," we understand the letter to have been written in June 2017. *Id.*

[35] *See also* App'x 1003–04 (Aug. 22, 2014); App'x 793 (Sept. 6, 2018); App'x 783 (Nov. 1, 2018); App'x 779 (Nov. 30, 2018); App'x 741 (June 13, 2019).

access to legal copies); App'x 821–25 (Dec. 27, 2017: describing, *inter alia*, late reviews); App'x 854–55 (June 2, 2017: asking Committee to address his prior submission, provide his prior Ad Seg reviews, and improve ventilation in his cell);[36] App'x 875 (July 4, 2016: describing late reviews, requesting responses to his submissions, and noting statement from Defendant Woodruff that "as long as [Woodruff was] DSS for at least the next two years [Walker would] not be released from Ad-Seg").

The Central Office Committee sometimes responded to Walker's questions and submissions.[37] Other times, it did not.[38] Except for one occasion, however, the Committee provided no guidance about what Walker could do to help demonstrate that he could safely be released from Ad Seg back into the general population. For example, the Committee was generally silent as to any available programs that Walker could complete that might give the Committee reason to conclude the risks he posed in the past had been reduced.

The Committee often characterized Walker's submissions as expressing entitlement or a lack of humility, or reflecting anger issues.[39] For example, the Committee wrote in its May 2018 review that Walker "has expressed a sense of entitlement to anything he wants"; in contrast, however, it had written in the same

---

[36] As noted previously, this letter appears erroneously dated "2012" rather than "2017."

[37] *See* App'x 994–95 (addressing Walker's Aug. 22, 2014 submission); App'x 831–32 (addressing Walker's Dec. 27, 2017 submission); App'x 785–86 (addressing Walker's Nov. 1, 2018 submission); App'x 776 (briefly addressing Walker's Dec. 25, 2018 submission); App'x 747 (addressing Walker's June 13, 2019 submission); App'x 765–66 (addressing the medical aspects of Walker's Jan. 26, 2019 submission).

[38] *See* App'x 866 (not addressing Walker's July 4, 2015, letter), App'x 846 (not addressing Walker's June 2, 2017 letter).

[39] *See* App'x 747–48, 751, 754, 780, 785–86, 800, 803, 806–07, 810–11, 841.

report that facility staff considered "none of inmate Walker's requests [to be] inappropriate or out of the ordinary," giving examples such as Walker's requests for a Ramadan menu and for responses to his law library requests. App'x 806–07. And in its July 2018 review, it wrote that Walker "maintains a sense of entitlement, always requesting something extra." App'x 800. This remark was apparently a reaction to statements in the Facility Committee's report reflecting that Walker had requested the last six months of his Ad Seg reviews and "packages, TV, commissary, and trailer visits." *See* App'x 798; *see also* App'x 803 (June 2018: describing Walker's "sense of entitlement" after Facility Committee reported Walker wished to receive and respond to his last several months of Ad Seg reviews); App'x 832 (Jan. 2018: writing that Walker "continues to blame others for his conduct" after Walker submitted evidence that contradicted the Committee's characterization of an incident described in a prior report).

Finally, in Walker's December 2018 review, the Central Office Committee for the first time provided some concrete suggestions regarding how Walker could demonstrate that he was ready to leave Ad Seg and live in the general prison population. App'x 780. It recommended that Walker enroll in two programs: one for anger management ("ART") and one for drug rehabilitation ("ASAT"). *Id.* In a written response to the Committee, Walker expressed gratitude for the guidance and explained his plans to enroll in the two programs. App'x 772, 775 ("I truly appreciate after 4 ½ years of being in Ad-Seg y'all have addressed my most stressed inquiry as to how I may be released from Ad-Seg . . . . I'm going to ask the ORC to be added to the waiting list for [the recommended programs].").

Walker completed one of the recommended programs, App'x 736, but was unable to complete the other because, as it turned out, the program did not exist in a

format available to him in the SHU. *See* App'x 747 (acknowledging, in June 2019 Central Office Committee review, that "ASAT does not have a workbook program").

As with Walker's Facility Committee reviews, his Central Office Committee reviews uniformly reflected that Walker had no new disciplinary infractions—except for the phone-call incident in 2017—and either described his interactions with staff as "appropriate," or otherwise communicated that he had no behavioral problems.[40] The reviews varied in their level of detail, sometimes discussing recent developments and addressing Walker's submissions and other times simply recounting Walker's violent past and providing the Committee's recommendation.[41]

In each of its reviews for which the record before us contains a copy,[42] the Central Office Committee agreed with the Facility Committee's recommendation that Walker should remain in Ad Seg. In one review, the Central Office Committee discounted Walker's recent extended track record of good behavior on the following rationale: it first acknowledged that "his notable instances of violence . . . all occurred more than 20 years ago," but then it reasoned that "his close supervision over the

---

[40] *See, e.g.*, App'x 738, 751, 754, 765, 769, 776, 789, 794, 800, 803, 806, 846, 859, 862, 866, 887, 897, 906, 914, 929, 936, 943, 959.

[41] App'x 1010, 993–95, 984, 959, 951, 943, 936, 929, 921, 914, 906, 897, 887–88, 866, 862, 859, 846–47, 841, 838, 831–32, 817–18, 814, 810–11, 806–07, 803, 800, 797, 794, 789, 785–86, 780, 776, 769, 765–66, 754, 751, 747–48, 738.

[42] Some Central Office Committee reviews appear to be missing from the record, namely reviews for March 2014, *see* App'x 1024–25; May 2014, *see* App'x 1017–18; November/December 2014, *see* App'x 974–75 (single-paragraph Central Office Committee review that appears cut off); March 2015, *see* App'x 967–68 (single-paragraph Central Office Committee review that appears cut off); and March 2019, *see* App'x 759 (single-paragraph Central Office Committee review that appears cut off). Reviews from all levels appear to be missing for the period between November/December 2014 and March 2015, *see* App'x 966–74, and the period between October 2016 and February 2017, *see* App'x 860–63.

subsequent years has arguably prevented continued violence." App'x 747. In another report, it wrote that Walker "will always remain a risk for violence because of his history of unexpected assaults." App'x 780.[43] And in two other reviews, the Committee encouraged Walker to "continue exhibiting appropriate behavior in order to earn additional incentives while in Administrative Segregation," making no mention of possible return to the general population. App'x 906, 929.

### iii.    Deputy Commissioner reviews

Following the Central Office Committee's review, Deputy Commissioner Bellnier—and, later, newly appointed Deputy Commissioner O'Gorman—invariably checked a box on the review form titled "A determination has been made to continue your Administrative Segregation for the following reasons."[44] App'x 913.

The line for stating the Deputy Commissioner's "reasons," however, was often left blank.[45] On other completed forms, the Deputy Commissioner gave a general conclusory reason, such as, "Your release from Admin. Segregation would pose a threat to the safety and security of the Institution," *see, e.g.*, App'x 873, or "Inmate Walker's placement is appropriate at this time," *see, e.g.*, App'x 796. These sentences were written in different handwriting or formats in Walker's many reviews, and Defendants apparently concede that the Deputy Commissioner's subordinates sometimes

---

[43] This report went on to note that "[p]rogramming may better prepare . . . Walker for eventual transition to a less restrictive environment," and to recommend that he enroll in two programs. App'x 780. As discussed above, one of those programs was not available to him. App'x 747.

[44] Defendant Bellnier served as the Deputy Commissioner until 2017, when Defendant O'Gorman assumed the position. App'x 542, 550.

[45] *See* App'x 863, 905, 913, 920, 928, 935, 957, 974.

completed this portion of the form in advance, on his behalf. *See* DOCCS Br. at 38–39; *see also Proctor*, 846 F.3d at 612–13 (noting evidence of the same practice by Bellnier).

   *iv. Timeliness of Walker's reviews*

  As discussed further below, Walker's Ad Seg reviews were often untimely completed, with long spells sometimes passing between when a review began and when it was completed by the Deputy Commissioner. *See Walker v. Bellnier*, No. 9-17-cv-1008, 2020 WL 9264839, at *3 (N.D.N.Y. Dec. 1, 2020) (summarizing review dates), *report and recommendation adopted*, 2021 WL 855842 (N.D.N.Y. Mar. 8, 2021). The record also reflects that Defendants often failed to provide Walker's reviews to him with enough time for him to respond to their factual contents before his next review period began. *See id.*; *see also* App'x 804, 801, 798, 795 (reflecting four months of Facility Committee interviews at which Walker asked to receive his prior Ad Seg reviews). Defendant Bellnier acknowledged these "unfortunate delays" in his declaration, App'x 548, as did Defendant O'Gorman, App'x 557.

## III. Procedural posture of this case

  Walker, proceeding *pro se*, filed suit in 2017, alleging claims under 42 U.S.C. § 1983 related to his continued incarceration in the SHU. After screening under 28 U.S.C. § 1915 and motions practice, in 2019 Walker filed a second amended complaint that omitted certain previously dismissed claims. The district court accepted that complaint as the operative document. *See Walker v. Bellnier*, No. 9-17-cv-1008, 2019 WL 11318050, at *2 (N.D.N.Y. June 10, 2019).

  The parties then conducted limited discovery, with Walker still proceeding *pro se* and (apparently) not in a position to conduct any depositions. *See infra* note 57. All parties then sought summary judgment. No. 9:17-cv-1008, Dkt. 79 (N.D.N.Y. Aug. 18, 2020); *id.* Dkt. 86 (N.D.N.Y. Oct. 29, 2020). Magistrate Judge Hummel issued a report

recommending that the district court grant Defendants' motion, reasoning that Walker's periodic reviews satisfied the *Proctor* criteria and, accordingly, that they were sufficiently meaningful to satisfy the Due Process Clause. *Walker*, 2020 WL 9264839, at *9–13. The recommendation did not reach Defendants' qualified immunity argument. *Id.* at *13. Later, then-Chief Judge Suddaby considered Walker's objections and adopted the report and recommendation in full. *Walker*, 2021 WL 855842, at *3. The district court ruled in the alternative that Defendants were entitled to qualified immunity "for the reasons stated in Defendants' memorandum of law." *Id.* Walker appealed, and we assigned *pro bono* counsel to represent him.

In 2021 while this appeal was pending, Governor Hochul signed the Humane Alternatives to Long-Term Solitary Confinement ("HALT") Act, S. S2836, 2021–2022 Leg. Reg. Sess. (N.Y. 2021). The Act, in recognition of the psychological harms solitary conditions can pose, prohibits correctional facilities from holding individuals in solitary confinement for more than fifteen consecutive days, or twenty total days in any sixty-day period, absent exceptions not relevant here. 7 N.Y.C.R.R. §§ 301.4(f), 301.1 (2022). The Act took effect on March 31, 2022. Also in March 2022, Defendants represent that DOCCS transferred Walker to a transitional, "step-down" unit outside of Upstate (which had no step-down unit of its own), ending Walker's term of solitary confinement after nearly 22 years. DOCCS Br. 22.

## DISCUSSION

This Court reviews a district court's grant of summary judgment *de novo*, "constru[ing] the evidence and draw[ing] all reasonable inferences in the light most favorable to the non-moving party." *Proctor*, 846 F.3d at 607. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

To prevail on a procedural due process claim, a plaintiff must demonstrate that Defendants "deprived him of a cognizable interest in life, liberty, or property," and that they did so "without affording him constitutionally sufficient process." *Proctor*, 846 F.3d at 608 (internal quotation marks omitted). Defendants do not dispute that Walker's prolonged Ad Seg term deprived him of a cognizable liberty interest, *Walker*, 2020 WL 9264839, at *6 (noting this concession before district court), and Walker does not challenge the adequacy of the process he received during his initial Ad Seg hearing, in 2014. Accordingly, the sole issue before this Court is whether Walker has raised a genuine issue of material fact as to whether from 2014 to 2019 Defendants failed to conduct meaningful periodic reviews of his Ad Seg status.

On review, and drawing reasonable inferences in Walker's favor, as we must, we conclude that he has presented sufficient evidence on that issue, and that a jury, not the court, must assess the evidence and determine the question.

I. **Walker's evidence closely tracks much of the evidence we found sufficient to preclude summary judgment in *Proctor*.**

As explained above, the Due Process Clause requires meaningful periodic review of an incarcerated person's Ad Seg status. *Hewitt*, 459 U.S. at 477 n.9; *Proctor*, 846 F.3d at 610. Walker does not dispute that Defendants provided him with a significant *amount* of process by conducting forty-six multi-tiered reviews during his relevant period of solitary confinement. But, as we explained in *Proctor*, the Due Process Clause requires more than going through the motions—the process must be provided "at a meaningful time and in a meaningful manner." *Proctor*, 846 F.3d at 609 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "Meaningful" review is not sham review; reviewing officials must "actually evaluate" whether the relevant individual "*remains* a security risk," and in doing so, they must "look to [the person's] present and future behavior and consider new events to some degree." *Id.* at 610–11 (internal quotation marks omitted).

37

Meaningful Ad Seg review is grounded in current, safety-related considerations and does not validate Ad Seg imposed simply as a "punishment for past transgressions." *Id.* at 611.

Patrick Proctor was—like Walker—housed in the SHU at Upstate Correctional Facility. He received periodic reviews under the same three-tiered process used for Walker, but in a slightly earlier timeframe (from approximately 2004 until at least 2017). *Id.* at 602–04. Defendant Bellnier was the Deputy Commissioner responsible for completing Proctor's Ad Seg reviews, and when Proctor later brought suit, he too named Bellnier as a defendant. *Id.* at 606.

Proctor, like Walker, committed acts of significant violence that led to his incarceration: he was serving a thirty-two-and-a-half-year sentence for second-degree murder, robbery, and attempted escape when he challenged his SHU confinement. *Id.* at 600. The record of his early years of incarceration, like Walker's, was severely scarred: he attempted to escape from police custody; he attempted to solicit another person to firebomb a residence; and he successfully escaped from the maximum-security Shawangunk Correctional Facility. *Id.* at 602. After his escape and capture, Proctor was sentenced to ten years of Disciplinary Segregation. *Id.* at 602–03.

During his first few years in the SHU, Proctor engaged in further misconduct: he "remove[d] his handcuffs without permission while in his cell," "concealed a razor in his rectum," "threw feces at DOCCS officials," "twice set fire to his cell," and "stabbed another inmate." *Id.* at 603. He also received numerous misbehavior reports, including for fighting and violent conduct. *Id.* But as his Disciplinary Segregation term passed, Proctor's behavior (again, like Walker's) "improved considerably," prompting officials to reduce his term in the SHU. *Id.*

After his Disciplinary Segregation term expired, DOCCS officials designated Proctor for Ad Seg, and he remained in the SHU for the next thirteen years. *Id.* Although Proctor's disciplinary record in Ad Seg was not pristine—he received disciplinary reports for "possession of contraband, lewd exposure, and unhygienic acts, littering and harassment," as well as for possessing "one unidentified weapon"—his behavior there was largely positive. *Id.* (internal quotation marks omitted).

Eventually, Proctor brought a *pro se* 42 U.S.C. § 1983 suit, alleging that the defendant DOCCS officials violated his procedural due process rights by retaining him in the SHU and failing to conduct meaningful periodic reviews of his Ad Seg status. *Id.* at 604. The district court granted summary judgment to the defendants, concluding that Proctor's reviews were sufficiently meaningful. *Id.* at 607 (citing *Proctor v. LeClaire*, No. 9:09-cv-1114, 2015 WL 5971043 (N.D.N.Y. Oct. 14, 2015)).

This Court vacated and remanded that judgment. We explained that "when process is nominally afforded to inmates over a significant period of time without any hint of success it may raise questions in a reasonable jury's mind about whether that process has been meaningful." *Id.* at 612. In doing so, we emphasized numerous pieces of evidence from which a reasonable juror could have concluded that Proctor's Ad Seg reviews were "no more than hollow formalities." *Id.*

At the threshold, we observed that several defendants had admitted in deposition testimony that "the standard DOCCS practice is that an [incarcerated person] 'never' gets out once he has been placed in Ad Seg." *Id.* They had further asserted that Proctor's "criminal history alone" could justify his continued Ad Seg confinement, notwithstanding years' worth of "genuinely positive" behavior. *Id.* And they had acknowledged that Proctor could do "nothing" to convince DOCCS officials to release him. *Id.* at 612–13. We did not rely solely on these damaging admissions, however, to reach our conclusion.

We pointed out further that "[a] reasonable jury could justifiably view [Deputy Commissioner] Bellnier's testimony as the illustration of a rubber stamp," because Bellnier's portion of the review was apparently completed for him in advance by the Central Office Committee; Bellnier admitted that he had never changed the recommendation of the Central Office Committee; and Bellnier "suggested that Proctor might not be removed from Ad Seg even if he did everything asked of him." *Id.* at 612–13.

In addition, we emphasized that much of Proctor's "review paperwork [was] repetitive and rote," including "years of virtually identical reports" filled with "boilerplate explanations." *Id.* at 613. We acknowledged that "[m]any of the . . . reports reflect detailed evaluations of the appropriateness of Proctor's continued Ad Seg term" and that they "occasionally" contained "specific objection-by-objection responses to Proctor's written complaints." *Id.* at 607. We concluded nonetheless that the paper evidence "raise[d] additional questions about whether Proctor's . . . reviews [were] designed to evaluate or to perpetuate his Ad Seg term." *Id.* at 613.

Finally, we stressed certain "red flags" in the reviewers' stated reasons for keeping Proctor in Ad Seg. *Id.* at 613–14. For example, the reviews characterized Proctor's daily cooperation with prison officials as "superficial" and interpreted it to be "an attempt to mask his resistance to authority," seeming not to admit the possibility that his good behavior might simply reflect a lastingly improved attitude. *Id.* at 613 (internal quotation marks omitted). Other reports also dismissed Proctor's good behavior as irrelevant on the ground that "SHU is so restricting that it precludes opportunities for misbehavior"—logic that we criticized as "patently circular." *Id.* at 613–14.

Significantly, and as our opinion recognized, not all of the evidence favored Proctor. Certain DOCCS officials testified, for example, that they employed "measured

review procedures," and we acknowledged that "[s]ome of the evidence could lead a reasonable jury to conclude . . . that DOCCS officials have analyzed Proctor's good behavior . . . and found it to be outweighed by other facts," including his escape attempts and violent acts. *Id.* at 614 (internal quotation marks omitted). Nonetheless, we remanded for trial, explaining that "[i]t is not our role on review of a grant of summary judgment . . . to weigh that evidence against the evidence favorable to Proctor's claim." *Id.* Because Proctor had "produced evidence to raise a fair question about the procedural sufficiency of his reviews," we concluded he had done "all that [was] required" to support the vacatur of summary judgment. *Id.*

We see similar features in the record before us, and turn now to examining them.

A. **Walker's reviews suggest that Defendants may have justified his continued Ad Seg placement based on long-past misconduct and without considering his more recent years of good behavior.**

As detailed above, large portions of Walker's reviews were "virtually identical," reflecting "repetitive and rote" explanations from which a reasonable jury could conclude that his reviewers "treated the process as satisfied by boilerplate explanations instead of a forthright review." *Proctor*, 846 F.3d at 613. Some reviews, for example, repeated the same typographical errors or mistakes as prior reviews, suggesting that they were copied and pasted without much care. *See, e.g.*, App'x 760 (writing that Walker "continues to exercises daily"); App'x 755 (same); App'x 846, 844, 841, 814, 806 (all stating that Walker's "most recent" disciplinary infraction occurred in 2014 despite a more recent infraction in June 2017). As we commented in *Proctor*, "repeated careless errors in documentation and rote application of Ad Seg's purported justifications [can be] evidence of meaningless reviews." 846 F.3d at 613 (internal quotation marks omitted).

We do not suggest that the repeated use of certain material across reviews, without more, necessarily creates a triable issue of fact. Walker's reviews, like Proctor's, generally used identical language to recite his criminal and disciplinary history, and reasonably so: his past is fixed, and his prior violent acts are worthy of significant emphasis—they cannot be ignored when attempting to predict whether he might pose a danger to facility security and safety. But a reasonable jury could find that the Facility Committee's use of virtually the same two-sentence justification for Walker's continued Ad Seg in each of the reviews available in the record, conducted over the course of five years, provided support for his argument that he was not afforded meaningful process.[46]

It is also striking that those portions of Walker's Facility Committee reviews that purported to set out the reasons to retain him in *or release him from* Ad Seg never mention his years-long record of good behavior.[47] Judging from the face of this

---

[46] App'x 736, 739, 749, 752, 755, 760, 767, 770, 777, 781, 787, 790, 795, 798, 801, 804, 808, 812, 815, 819, 833, 836, 839, 842, 845, 853, 858 ("Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security [and good order] of the facility."), 860, 863, 873, 895, 905, 913, 920, 928, 935, 942, 949, 957, 966, 974, 983, 992, 1009, 1017, 1024 ("Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community. Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility."). *See supra* 29 & n.31. Again, the relevant page of the report produced at App'x 966 is missing from the record.

[47] The dissent suggests that due process was satisfied because the reviews on occasion note "positive developments in Walker's favor" somewhere in their texts. *See* Dissent at 11. But this approach ignores *how* the reviews discuss Walker's behavior (when they mention it at all). They do not discuss Walker's developments as a factor in the decision to retain or release him. On

important section of the Facility Committee's reports, a reasonable juror could conclude that Walker's reviewers did not consider his positive disciplinary record—reflecting only one, nonviolent infraction during his five years at Upstate and no violent incidents in nearly two decades—as relevant to their decision, never mind the reviewers actually considering that record as part of their analysis. This is not to say that we are generally skeptical of reviews that consistently reach the same outcome, or those that consider a person's pre-segregation conduct as part of their analysis. But a reviewer's failure to engage expressly with positive developments must be seen as relevant to the due process inquiry; a lack of engagement may unmistakably signal a lack of process.

Our dissenting colleague criticizes us for failing to apply a "presumption of regularity" to the record before us. He would have us apply the presumption to conclude that, despite their silence on Walker's positive record, his reviewers considered his good behavior in formulating their recommendations. Dissent at 14–18. Defendants did not present this argument on appeal, perhaps because when presented with that proposition, the Court in *Proctor* had rejected it. 846 F.3d at 608 n.4. The panel observed, "Defendants cite no case, and we cannot find one, that applies such a presumption in a constitutional challenge to state prison officials' periodic review of Ad Seg." *Id*. We, too, reject it for substantially the same reason.[48]

---

this basis, a reasonable juror might conclude that the reviews reflect a lack of meaningful process.

[48] *See also U.S. ex rel. Tyrrell v. Speaker*, 535 F.2d 823, 828–29 & n.10 (3d Cir. 1976) (concluding, in the context of an official's qualified immunity argument against a Fourteenth Amendment claim based on Ad Seg placement, "we reject defendant's contention that his good faith was established because 'public officials are presumed to have acted lawfully and in good faith'").

The cases cited by the dissent in support of its criticism are inapposite: they present circumstances tied far more tightly to the separation of powers concerns that underlie the presumption when it is used. *See* Note, The Presumption of Regularity in Judicial Review of the Executive Branch, 131 Harv. L. Rev. 2431 (June 2018). Many involve core discretionary decisions

Instead of applying this presumption, we look to the reasons set forth in the reviews themselves—including the Facility Committee's rote adherence to its original rationale for holding Walker in Ad Seg and its repeated failures to discuss or evaluate the impact of his nearly unblemished disciplinary record. From this evidence, we think, a reasonable juror could conclude that Walker's reviews were "frozen in time, forever rehashing information" addressed at his initial Ad Seg determination, as the *Proctor* court warned against. 846 F.3d at 611; *see also H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 374 (N.D.N.Y. 2020) ("[A] reasonable fact finder could conclude that Defendants used Plaintiff's remote violent conduct prior to being placed in Ad Seg (and his sporadic,

---

of the Executive branch, such as whether to bring a criminal prosecution. *See Hartman v. Moore*, 547 U.S. 250, 263–65 (2006) (applying presumption in retaliatory prosecution case); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (same); *see also Reno v. Am.-Arab Anti-Discrimination Committee*, 525 U.S. 471, 489 (1999) (applying the presumption to allegedly selective federal deportation decisions).

Other applications also lie far afield of the constitutional due process claim asserted by Walker: In *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004), cited by the dissent, the Court applied a similar presumption in the context of an agency's statutory claim—the government's assertion of a privacy-based exemption to a FOIA request. The Court ruled that the requester would need to "establish more than a bare suspicion" that the exemption was invoked in bad faith to overcome the asserted exemption. *Id.* And in *Xiao Ji Chen v. USDOJ*, 434 F.3d 144, 159 n.13 (2d Cir. 2006), after affirming an administrative immigration ruling, the Court simply mentioned in a footnote the presumption "that an IJ has taken into account all of the evidence before him" in rejecting the petitioner's challenge to a credibility finding. *See also Nieves v. Bartlett*, 587 U.S. 391, 400, 402 (2019) (contrasting a retaliatory arrest claim with a retaliatory prosecution claim, and observing that the presumption applies only to the latter).

As Judge Hamilton wrote in *Conley v. United States*, rejecting the presumption's application to a selective enforcement claim, "The presumption of regularity is an analytic tool, not an excuse to rubberstamp any and all executive action as lawful absent clear evidence to the contrary." 5 F.4th 781, 791 (7th Cir. 2021). The presumption has no appropriate application here.

44

relatively minor non-violent incidents while in Ad Seg) as a pretext for their desire to keep him in Ad Seg in order to punish him for past conduct.").[49]

To be clear, we do not suggest that some quantum of good behavior can necessarily overcome a professional penal judgment based on DOCCS employees' on-the-ground evaluation of an individual's current risk of violence. Nor do we suggest (as our dissenting colleague would interpret our decision) that Walker is necessarily entitled to release from Ad Seg simply because he behaves well for any particular period of time. *See* Dissent at 30. Walker's past was marked by extreme violence, and prison officials were entitled to "accord[] significant weight" to those past events, as we reasoned in *Proctor*. 846 F.3d at 611.

Nonetheless, the touchstone of a constitutionally meaningful Ad Seg review must be an official's assessment of the individual's *current* risk of violence or behavior that would impair the safety or security of the correctional facility. *Id.* As we and other circuits have held, the fact that an individual was retained in Ad Seg despite years-long stretches of good behavior,[50] without prison authorities evidencing any real recognition

---

[49] In this decision, the district court denied defendants' motion for summary judgment against H'Shaka on his amended complaint challenging his lengthy detention in Ad Seg. In a decision cited above at 3, *e.g.,* we earlier affirmed the court's denial of his request for a preliminary injunction based on his initial complaint. In doing so, we expressed concern about his continued detention but emphasized the absence of important detail in the record that had been made at that stage. *H'Shaka*, 758 F. App'x at 199–201. While that appeal was pending, H'Shaka amended his complaint to include a more detailed set of factual allegations; some of these claims eventually survived summary judgment and proceeded to trial. *H'Shaka*, 444 F. Supp. 3d at 372–90.

[50] That Walker received two misbehavior reports for nonviolent infractions while in Ad Seg does not defeat our conclusion that he has raised a genuine issue of material fact as to whether his reviews were meaningful. Proctor also received "minimal" disciplinary reports while he was in Ad Seg, including one for possessing a weapon, yet we nonetheless determined that his claims survived summary judgment. *Proctor*, 846 F.3d at 603.

of that fact, provides a sound basis for a jury to infer that his reviews were not

constitutionally meaningful and makes summary judgment inappropriate. *Id.* at 612–13;

*see Isby v. Brown*, 856 F.3d 508, 528 (7th Cir. 2017); *Incumaa v. Stirling*, 791 F.3d 517, 534

(4th Cir. 2015); *H'Shaka*, 758 F. App'x at 199–20; *H'Shaka*, 444 F. Supp. 3d at 374.[51]

## B. A reasonable juror could view the Deputy Commissioner's review as a "rubber stamp" here.

Walker could not be released from Ad Seg without the Deputy Commissioner's

approval: the Deputy Commissioner provided the final, dispositive review of his Ad

Seg status. App'x 552. During his dispositive reviews, however, the Deputy

Commissioner provided only generic, boilerplate reasons for retaining Walker in Ad

Seg—when he provided reasons at all.

At least eight of Walker's forty-six reviews do not provide any reasoning in the

Deputy Commissioner's portion of the review.[52] And when the Deputy Commissioner

---

[51] The dissent suggests that housing in the general population provides relaxed conditions of incarceration and, on our read, that an incarcerated person held in Ad Seg bears the burden of demonstrating entitlement to housing with the general population. *See* Dissent at 3–4, 20–21, 29. Respectfully, this inverts the appropriate inquiry. By statute, regulation, and caselaw, DOCCS bears the burden of reviewing an incarcerated person's placement in Ad Seg and ensuring that solitary confinement remains justified. N.Y. Corr. L. § 137 (authorizing superintendents to remove individuals from the general population "for such period as may be *necessary* for maintenance of order or discipline") (emphasis added); *see Hewitt*, 459 U.S. at 477 n.9 ("Prison officials must engage in some sort of periodic review" to determine "whether a prisoner remains a security risk."). As we explained in *Proctor*, "the validity of the government's interest in prison safety and security as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk." *Proctor*, 846 F.3d at 611 (internal quotation marks omitted) (alteration adopted). Accordingly, a person held in solitary confinement has a "protected interest in leaving those conditions" when the justification for that confinement no longer exists. *Thorpe v. Clarke*, 37 F.4th 926, 943 (4th Cir. 2022) (internal quotation marks omitted).

[52] *See* App'x 863, 905, 913, 920, 928, 935, 957, 974 (leaving line for reasons blank); *see also* App'x 858 (writing "see above" as reason).

46

did state a reason for retaining Walker in Ad Seg, that statement appears to have been completed for him by a subordinate, before the Deputy Commissioner had even begun his review, *see* DOCCS Br. at 38–39—suggesting that the third level of the multilayer review process may have been cursory at best.

In other words, a reasonable juror could doubt that this last, determinative level of review was meaningful. *See Proctor*, 846 F.3d at 612–13 (concluding that reasonable juror could view Bellnier's review as a "rubber stamp," in part because he "merely signs the bottom" of the pre-filled form); *see also Incumaa*, 791 F.3d at 534 [4th Cir.] (stressing insufficiency of single-tiered review process where dispositive reviewer "merely rubber-stamped" plaintiff's continued confinement with "rote," "perfunctory explanation"); *Williams v. Hobbs*, 662 F.3d 994, 1001–02 (8th Cir. 2011) (affirming post-trial finding that Wardens' reviews were not meaningful where they frequently checked pre-printed boxes stating that Williams remained a "threat to the security and good order of the institution" as their only written justification for continued Ad Seg).

## C. The documentary evidence includes "red flags" similar to those identified in *Proctor*.

As noted above, the evidence adduced by Walker also reflects some of the same logic that in *Proctor* we said raised "red flags about whether the underlying reviews were conducted genuinely." 846 F.3d at 613. Both the Central Office Committee's reports and the Deputy Commissioners' declarations, for example, discounted Walker's good behavior by attributing it to the conditions of his solitary confinement—the same "patently circular" logic that we rejected in *Proctor*. *Id.* at 613–14.[53]

---

[53] The dissent objects to our use—and the *Proctor* panel's use—of the term "circular logic"; in our colleague's view, this reasoning does not satisfy the rhetorical definition of circularity. *See* Dissent at 12–13. Regardless of the label ascribed, a reasonable juror confronted with evidence that an official is discounting good behavior by attributing it to the conditions of Ad Seg might

47

In Walker's June 2018 Central Office Committee review, the Committee wrote that, while Walker's "notable instances of violence . . . all occurred more than 20 years ago . . . his close supervision over the subsequent years has arguably prevented continued violence." App'x 747. Bellnier testified that Walker's improved behavior "may have been due to his maturation, but also was likely affected by the restrictions placed upon his movement and interactions with staff and other incarcerated individuals." App'x 546. And O'Gorman testified that "the opportunity for Tyrone Walker to commit violent acts has been greatly reduced by his Ad Seg placement," and that because of Ad Seg "Walker has been unable to threaten the lives of DOCCS staff, as he did at Green Haven when he had more privileges available to him." App'x 556.

We found similar statements "troubling" in a recent summary order and suggested that, at the summary judgment stage, they might cause a reasonable juror to question the robustness of their authors' analyses. *H'Shaka*, 758 F. App'x at 200. The district court subsequently agreed, finding genuine issues of material fact as to whether the plaintiff's Ad Seg reviews were meaningful. *H'Shaka*, 444 F. Supp. 3d at 375.

Our precedents—and Walker's record, like Proctor's—cast deep doubt on Defendants' rationale for discounting Walker's good behavior in the SHU. In his early days in Disciplinary Segregation, when his conditions of confinement were identical to those he faced in Ad Seg, Walker himself received nearly a dozen misbehavior reports. App'x 568–69. And although none of those infractions by Walker was violent, Proctor was apparently able to engage in significant aggressive conduct while he was housed in

conclude that the official was conducting a meaningless review with a predetermined outcome. *See Proctor*, 846 F.3d at 613–14; *Williams*, 662 F.3d at 1002 [8th Cir.] (official's reasoning that "years of incident-free conduct" was attributed to isolation and statements that "clean history was irrelevant" supported conclusion that Ad Seg reviews were not meaningful); *see also Quintanilla v. Bryson*, 730 F. App'x 738, 745 (11th Cir. Apr. 5, 2018) (unpublished) ("Given Quintanilla's allegations of good behavior . . . [his] past act alone is not sufficient to justify his continued confinement[.]").

the Upstate SHU.[54] H'Shaka, too, was apparently able to commit four assaults while he was housed in the SHU at Clinton. *H'Shaka*, 758 F. App'x at 197. A reasonable juror therefore might view the Commission's determination that little could be inferred from Walker's good behavior while in the SHU from 2014–19 as pretextual.

Separately, the Central Office Committee appears repeatedly to have used Walker's attempts to participate in his Ad Seg review process as a reason for keeping him in the SHU. When Walker requested things to which he was in fact entitled—including medical care, legal resources, and copies of his own Ad Seg reviews—the Committee identified his "sense of entitlement" as a reason to continue his Ad Seg, sometimes in the face of the acknowledgement of DOCCS's own employees that Walker's requests were reasonable and appropriate.[55] And when Walker explained that he had been unable to enroll in a drug rehabilitation program that the Committee

---

[54] As noted above, Proctor "managed to remove his handcuffs without permission while in his cell . . . threw feces at DOCCS officials . . . twice set fire to his cell . . . concealed a razor in his rectum . . . stabbed another inmate" and received numerous disciplinary reports, including for "fighting" and "violent conduct." *Proctor*, 846 F.3d at 603.

[55] *See* App'x 800, 803, 806–07, 814. When Walker submitted evidence attempting to counter the Central Office Committee's characterization of his behavior, the Committee also failed to recognize any ambiguity of tone, describing him definitively as "demonstrat[ing] a sense of entitlement and frustration, rather than insight." App'x 780; *see also* App'x 785–86, 831–32 (similar). Although we do not suggest that an incarcerated person's attitude should have no bearing on his Ad Seg reviews, the connection between a "sense of entitlement" and the safety and security of a facility strikes us as at best uncertain. A reasonable juror might construe the fact that reviewing officials relied on such justifications to suggest that they were motivated by a desire to punish Walker—either for perceived impertinence or for his past misconduct—rather than by safety and security considerations. *See Proctor*, 846 F.3d at 611; *see also Thorpe*, 37 F.4th at 946 [4th Cir.] (finding complaint to state a procedural due process claim where plaintiffs alleged prison officials retained them in solitary confinement based on "metrics unrelated to prison security like hygiene, rapport with guards, and respect"); *Isby*, 856 F.3d at 526 n.17 [7th Cir.] (suggesting that nonviolent misbehavior like being "argumentative and disrespectful" or "repeatedly talking back to prison guards" may not be sufficient to justify "long stretches of solitary confinement").

recommended but noted that he "[didn't] have a drug problem anyway," the Committee took him to task for not viewing the program as "another opportunity for personal growth." App'x 747. Yet in the very same paragraph, the Committee acknowledged that the relevant program was not available to Walker because it "d[id] not have a workbook program" for individuals in the SHU. *Id.*[56] A reasonable juror could conclude that a reviewer's characterization of these statements as reflecting Walker's "entitlement" reflects a predisposition to find fault with Walker's behavior notwithstanding wholly innocuous explanations.

In sum, these statements by the Central Office Committee could cause a reasonable juror to doubt "whether the underlying reviews were conducted genuinely," *Proctor*, 846 F.3d at 613, or whether DOCCS officials used Walker's submissions as "pretext to justify further punitive segregation," *H'Shaka*, 758 F. App'x at 200.

### D. Walker need not produce smoking-gun deposition testimony to create a genuine issue of material fact.

Defendants insist that Walker's arguments fail because he has not provided "affirmative evidence of pretext," a requirement they draw from *Proctor*. DOCCS Br. at 33–37. But *Proctor* did not so hold; in reaching its conclusion, it identified several categories of evidence that, in its view, also reflected that the defendants had predetermined the results of Proctor's Ad Seg reviews, as surveyed above. Walker has provided ample evidence of a similar sort. At the summary judgment stage, that is what *Proctor* requires. *Proctor*, 846 F.3d at 614 ("That Proctor has produced evidence to raise a

---

[56] The dissent suggests that the review process went "beyond the requirements of due process" by suggesting these "criteria" for Walker's progression. *See* Dissent at 18–21. We are skeptical that the suggestion of programs—particularly one that was not available to Walker—could overcome other indicators of deficiencies in the process afforded to Walker. Regardless, these recommendations are another fact that a reasonable juror could choose to credit or discredit when evaluating whether Walker received the process he was due.

fair question about the procedural sufficiency of his reviews is all that is required today.").

The *Proctor* court did emphasize, to be sure, that some defendants openly admitted to holding Proctor in Ad Seg based solely on his past conduct, *id.* at 612–13, and it is true that Walker has not produced such statements.[57] But we take *Proctor* to have treated these kinds of statements as *sufficient* to "raise questions in a reasonable jury's mind about whether that process has been meaningful"—not as *necessary* to do so. *See id.* at 612–14 (discussing other categories of evidence that might raise such questions).

In *H'Shaka*, for example, the district court acknowledged that the plaintiff had not produced any *Proctor*-type admissions, but it simply concluded that the absence of such evidence required it to "more closely consider the specific facts of th[e] case," and to evaluate whether "the committee reviews themselves" and the "surrounding circumstances supported by the evidence" raised triable issues. 444 F. Supp. 3d at 373–374. It determined that they did so. *Id.* at 374–75. *Accord Incumaa*, 791 F.3d at 534–35 [4th Cir.] (vacating grant of summary judgment to defendants despite no testimonial admissions). The same is true here.

Last, even if *Proctor* required Defendants to admit that they formed a pre-review conclusion about whether Walker would ever be released from Ad Seg—which it does not—Walker has pointed to several statements that would likely qualify. In one review, for example, the Central Office Committee stated that Walker "will always remain a risk for violence because of his history of unexpected assaults." App'x 780. In two other

---

[57] Indeed, Walker has not deposed Defendants at all, as he was proceeding *pro se* below and could not afford to do so. *See* App'x 490 (noting that Walker lacked even the funds to make legal copies).

reviews, the Committee wrote that continued good behavior could help Walker "earn additional incentives while in Administrative Segregation," suggesting that while incentives might have been on the table, release from Ad Seg was not. App'x 906, 929. And Walker testified during his deposition that Defendants Woodruff and Cook told him during their first meeting that they would never recommend he be released from Ad Seg. App'x 485, 487.[58]

Although both Cook and Woodruff denied making these statements, App'x 313, 1045, it is for the jury to weigh that conflicting evidence, especially when Walker's testimony is altogether plausible in light of the record of the review process that Defendants conducted. *Proctor*, 846 F.3d at 614 ("It is not our role on review of a grant of summary judgment . . . to weigh that evidence against the evidence favorable to Proctor's claim."); *see also Selby v. Caruso*, 734 F.3d 554, 557–58, 560 (6th Cir. 2013) (vacating grant of summary judgment to defendants although defendants denied saying they would never release plaintiff from Ad Seg).

## II. A reasonable juror might also doubt the meaningfulness of Walker's reviews because DOCCS often failed to complete or provide them in a timely way.

Walker presents an additional category of evidence that was not at issue in *Proctor*: the record reflects that DOCCS regularly failed to complete or to provide Walker's reviews to him before the next review period began, suggesting that he often had little notice of the reasons for his continued confinement and little if any opportunity to respond to them at an appropriate time. We do not hold, here, that the

---

[58] This portion of Walker's deposition may be considered as evidence at the summary judgment stage because it is based on his personal knowledge, relates to matters on which he is competent to testify, and sets out statements that would be admissible in their current form under Federal Rule of Evidence 801(d)(2) (relating to statements of party-opponents). Fed. R. Civ. P. 56(c)(4); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).

delay in completing and providing reviews could, in and of itself, amount to a constitutional violation. But we think that these deficiencies are another indicium of the process Walker received, and that a reasonable juror might rely on them to support the conclusion that his due process rights were violated.

## A.    Delays in completing Walker's reviews

Long spells sometimes passed between when one of Walker's reviews began and when it was completed by the Deputy Commissioner. *See Walker*, 2020 WL 9264839, at *3. For example, between April 2015 and August 2017, only two of Walker's reviews were completed before his next review period began—and on each occasion, the Deputy Commissioner signed a timely review despite the fact that another, older review was still pending.[59] Walker's January 2017 report was not signed until July 31, 2017, after two full review periods had elapsed and another had begun. App'x 853, 858, 860. Four full review periods passed before Defendant O'Gorman completed Walker's August 2017 review on December 12, 2017. App'x 833, 836, 839, 842, 845.

A reasonable juror could conclude that the delay supported a conclusion that the Deputy Commissioner's review was not meaningful regarding these earlier periods, since he had already decided that Walker should be retained in Ad Seg through a later date. *See Proctor*, 846 F.3d 610 ("Review with a pre-ordained outcome is tantamount to no review at all."). We stated something similar in *H'Shaka*, suggesting without deciding that DOCCS's "consistent failure to finish its 60-day reviews before the next review cycle began" could be taken as evidence that "the reports were delayed because DOCCS did not take them seriously." *H'Shaka*, 758 F. App'x at 200–01.

---

[59] *Compare* App'x 905 (May 2016 review signed on June 15, 2016), *with* App'x 913 (March 2016 review signed on June 27, 2016); *compare also* App'x 863 (October 2016 review signed on December 2, 2016), *with* App'x 873 (August 2016 review signed on February 10, 2017).

## B.     Delays in providing Walker his reviews

Even when Walker's reviews were completed in a timely fashion, DOCCS often failed to provide them to Walker with enough time for him to address the Committees' reasons before it was time to complete his next review. For example, Walker did not receive his August 2016 review until February 2017; his January 2017 review was not provided until August 2017; his June and August 2017 reviews were apparently not provided until December 2017; and the nine reviews that spanned from September 2017 to May 2018 were provided in a single batch on January 24, 2019—nine days after the Magistrate Judge recommended denying the Defendants' motion to dismiss this case.

Walker's ability to respond to the allegations in his reviews at least sometimes made a difference, as illustrated by a string of reviews between February 2018 and March 2019. In its February 2018 review, the Central Office Committee described an incident where Walker reportedly became enraged and suggested "that he would have assaulted . . . DSS [Woodruff]" after Walker's visitor forgot to take a package after a visit. App'x 814. The Central Office Committee pointed to this incident as showing that Walker was not ready to leave Ad Seg. *Id.* It repeated a similar account of the incident in its May 2018 review. App'x 807.

Walker did not receive these reviews until January 2019. App'x 762. After reviewing them, he submitted a letter asserting that the Committee was wrong about the incident and that Defendant Woodruff had actually held the package for Walker until someone else could pick it up—something Woodruff was not required to do. App'x 756–57. Walker wrote that he had expressed gratitude to Woodruff and never

threatened to hurt him. *Id.*[60] The Committee acknowledged this correction in its March 2019 report, App'x 244, and never referred to the incident again.

A similar situation played out regarding DOCCS's description of Walker's February 2014 disciplinary infraction. The misbehavior report for that incident recounted that Walker handed over a small, crescent-shaped piece of metal to the officer conducting rounds and told the officer that he had done a "good deed" and should get "an award." App'x 669. The misbehavior report specified that the incident involved neither the use of force, nor any workplace violence, nor any use of a weapon. App'x 672. The report made no reference to a pending transfer and did not suggest that Walker was trying to avoid transfer by misbehaving. *See* App'x 670–72. For more than a year, the Central Office Committee did not discuss the incident in any detail in its reports.

In Walker's December 2015 review, however, the Central Office Committee wrote for the first time that "Walker has a unique propensity for obtaining and crafting weapons. One such incident occurred at Clinton Correctional Facility because he didn't want to be moved and believed that if he had a disciplinary infraction his transfer would be cancelled." App'x 929. It recommended continued Ad Seg and cited "Walker's ability to obtain and fashion deadly weapons; his prior use of violence in an attempt to manipulate his pending transfer and the unpredictability of when such a future incident might occur." *Id.* His February 2016 review repeated a version of the same narrative. App'x 921.[61]

---

[60] Woodruff's interrogatory responses provide some support for Walker's account of the incident, agreeing that Walker expressed gratitude to him "on certain occasions" and stating that Woodruff was not aware of Walker ever threatening correctional staff. App'x 209, 307–08.

[61] The review stated that Walker "purposefully obtained or created a weapon in February 2014 . . . after he found out he was being transferred . . . . He knew possession of such

55

Although the record is not clear as to when and if Walker received his December 2015 and February 2016 reviews, he apparently did not learn that the Central Office Committee was describing the 2014 incident this way until July 2016, at which time he contested the characterization in his ORC interview, App'x 895, and in a letter to the Central Office Committee, App'x 875–80. In his letter, he took issue with the review's account, pointing out that his security classification did not allow him to know when he would be transferred and that, at any rate, he "hated" Clinton and had requested to be transferred every year that he was eligible. App'x 876. He also maintained that he would never intentionally incur a misbehavior report and reminded the Committee that he had contested the 2014 report strenuously. *Id.*

The Central Office Committee did not repeat its characterization of the 2014 incident in its next five reports. App'x 897, 887–88, 866, 862, 859. By June 2017, however, the narrative was back, App'x 856, and the Committee repeated it in Walker's November 2017 and December 2017 reviews, App'x 838, 835. At the end of December 2017, Walker made another written submission to the Committee, repeating his prior statements about the 2014 incident. App'x 823. In its January 2018 review, the Committee acknowledged that Walker's letter "contend[ed] . . . that the information forming the basis of the Committee's prior reviews is false." App'x 831. It never repeated the manipulation narrative again. App'x 831.[62]

In short, a reasonable juror could infer from these facts that DOCCS failed to give Walker an opportunity to respond to its reasons for keeping him in Ad Seg because the

---

contraband would result in a Tier III disciplinary infraction and believed that this would cause his transfer to be cancelled." App'x 921.

[62] *See* App'x 817, 814, 810–11, 806–07, 803, 800, 797, 794, 789, 785–86, 780, 776, 769, 765, 754, 751, 747–48 (describing Walker as "capable of manipulation" but not recounting the contested incident), 738.

reviewing officials planned to keep him there no matter what he said, and no matter whether their purported justifications were accurate. *See Proctor*, 846 F.3d at 610 ("It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the [designated individual] will be confined in Ad Seg no matter what the evidence shows.").

To be sure, DOCCS officials' failure to follow the portion of § 301.4(d) that provided Walker an opportunity to respond to his reviews cannot, in itself, establish a Due Process violation. *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Hewitt*, 459 U.S. at 477 n.9 (stating that Due Process Clause "will not necessarily require" prison officials to "permit the submission of any additional evidence or statements"); *see also* 7 N.Y.C.R.R. § 301.4(d)(3). Bureaucracies often operate inefficiently and generate errors of various innocent sorts.

It does not follow, however, that the repeated failures here are irrelevant to the Due Process analysis. The Supreme Court has referred to "[n]otice of the factual basis for [placement in solitary confinement units] and a fair opportunity for rebuttal" as "among the most important procedural mechanisms" under the Due Process Clause. *Wilkinson v. Austin*, 545 U.S. 209, 211 (2005). And we seemed to rely on the absence of such protections when we sustained a similar procedural due process challenge in the face of a motion to dismiss in *Iqbal v. Hasty*, a case involving Ad Seg in the federal prison system. 490 F.3d 143, 164 (2d Cir. 2007), *abrogated on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).[63] Regardless of whether the Due Process Clause

---

[63] Several of our sister circuits interpret the Due Process Clause to require prison officials to provide individuals held in solitary confinement with regular statements containing the reasons for their continued confinement, and with an opportunity to respond to those reasons. *See Williams*, 848 F.3d at 576 (applying requirement to continued solitary confinement on death

required DOCCS officials to provide Walker with notice and an opportunity to respond to its reasons for continuing his Ad Seg confinement—a question the parties do not ask us to decide—Defendants' repeated failure to provide those procedural protections raises a genuine issue of material fact as to whether Walker's reviews were meaningful. In our view, a reasonable jury could find that they were not.[64]

### III. Walker has raised genuine issues of material fact as to whether Defendants are entitled to qualified immunity.

We review *de novo* a district court's grant of a motion for summary judgment based on qualified immunity. *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019). In doing so, we consider "(1) whether the facts, taken in the light most favorable to the party asserting the injury, show the [defendant's] conduct violated a federal right, and (2) whether the right in question was clearly established at the time of the violation." *Id.* (internal quotation marks omitted). Defendants bear the burden of establishing their entitlement to qualified immunity. *Palmer v. Richards*, 364 F.3d 60, 67 (2d Cir. 2004).

Summary judgment is unavailable when the parties dispute facts material to the question of qualified immunity. *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (per

---

row); *Toevs v. Reid*, 685 F.3d 903, 913 (10th Cir. 2012) (applying requirement at least where purpose of individual's segregation is "to encourage [him] to improve his future behavior"); *Hobbs,* 662 F.3d at 1006–09 [8th Cir.] (applying requirement to Ad Seg reviews); *see also Thorpe*, 37 F.4th at 944–45 [4th Cir.] (denying motion to dismiss procedural due process claim where prison review procedure allegedly "transgress[ed] even the most foundational building blocks of due process: notice . . . and an opportunity to be heard"); *but see Isby*, 856 F.3d at 527 [7th Cir.] (noting that a statement of reasons for continued Ad Seg "may not to be constitutionally required").

[64] Because a reasonable juror could construe these delays as suggesting that the reviews were not sufficiently meaningful, we need not decide whether they were also sufficiently "periodic" to satisfy the Due Process Clause requirements articulated in *Hewitt*, 459 U.S. at 477 n.9; *see also Fludd*, 568 F. App'x at 73 (remanding for determination "whether the failure to conduct regular [Ad Seg] status reviews violated constitutional due process").

curiam) (denying qualified immunity to prison officials in the face of "conflicting accounts" of whether plaintiff was excluded from religious services without legitimate penological justification); *Palmer*, 364 F.3d at 67–68 (denying qualified immunity to prison officials due to dispute whether plaintiff's SHU confinement implicated liberty interest).

Since *Hewitt*, it has been clearly established that "administrative segregation may not be used as a pretext for indefinite confinement" and that individuals in Ad Seg are entitled to meaningful periodic reviews. 459 U.S. at 477 n.9; *see also Proctor*, 846 F.3d at 610. Defendants do not seriously dispute this proposition. *See* DOCCS Br. at 42–43. Instead, they focus on the first prong of the qualified immunity inquiry, arguing that Walker has failed to raise a genuine issue of material fact as to whether they provided reviews that were not constitutionally meaningful. *See id.* at 43.

We reject this argument for the same reasons we discuss above regarding the merits of Walker's Due Process claim. Walker has raised genuine issues of material fact as to whether his reviews were meaningful. To find at this stage that Defendants have qualified immunity would require us to resolve such issues. We may not do so. *Wiggins*, 86 F.4th at 996; *Jones v. Parmley*, 465 F.3d 46, 63–64 (2d Cir. 2006) ("[T]he numerous disputed material facts preclude[] the grant of qualified immunity").

Other circuits have rejected requests to determine qualified immunity in a similar procedural posture. *See, e.g., Thorpe v. Clarke*, 37 F.4th 926, 944–46 (4th Cir. 2022); *Selby*, 734 F.3d at 559–60 [6th Cir.]; *Isby*, 856 F.3d at 530 [7th Cir.]; *Black v. Parke*, 4 F.3d 442, 450 (6th Cir. 1993); *see also H'Shaka*, 444 F. Supp. 3d at 390 [N.D.N.Y.]; *but cf. Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (granting summary judgment to defendants on qualified immunity because it was not clearly established how *Hewitt* applied to placement in "stratified behavior-modification program," as opposed to in SHU).

The dissent argues to the contrary. As we understand it, our dissenting colleague interprets this opinion as announcing a "new rule" to the effect that prison officials must provide individuals with an opportunity to be released from Ad Seg and that, unless release into the general prison population is made a realistic possibility, prison officials have violated the individual's due process rights. Dissent at 3–4, 30. But we announce no such new rule today; we merely apply and underscore *Proctor*'s instruction that, "when process is nominally afforded to inmates over a significant period of time without any hint of success[,] it may raise questions in a reasonable jury's mind about whether that process has been meaningful." 846 F.3d at 612; *see id.* at 613 (writing that a review regime with "no goalposts . . . cannot satisfy *Hewitt*.").

That is not to say that Defendants should have released Walker from Ad Seg to the general prison population before 2019, or even that he is likely to prevail on the merits or in rebutting a qualified immunity defense at trial. We express no opinion on these questions. As we underscored in *Proctor*, "[p]rocedural due process does not permit a court to review the substance of Defendants' decision to confine [a person] in Ad Seg." *Id.* at 608.

Still, *Proctor*'s admonition cuts both ways: Where the evidence shows that a plaintiff received constitutionally sufficient process, a reviewing court may not look beyond that process based on any dissatisfaction with the substantive outcome. But neither may the reviewing court overlook evidence of a constitutionally *insufficient* process when in agreement with DOCCS's ultimate decision. Our summary judgment analysis asks only whether Walker has produced evidence from which a reasonable juror could conclude that his Ad Seg reviews were not meaningful. *Proctor*, 846 F.3d at 614. After close review of the record, we conclude that he has done so.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings.

MENASHI, *Circuit Judge*, dissenting:

The majority concludes that a reasonable juror could find it so "striking" and "troubling" and therefore a "sham" that, after reviewing Tyrone Walker's placement in administrative segregation forty-six separate times, prison officials consistently concluded that he belonged there. *Ante* at 37, 42, 48. The officials decided that "Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility." J. App'x 863.

Far from suggesting a lack of meaningful consideration, it is difficult to imagine a more reasonable assessment. As the Facility Committee explained, when Walker was confined at the Green Haven Correctional Facility, he "armed himself with two homemade weapons"—a ten-inch butcher knife and a six-inch icepick—that he secured to each of his hands "by leather thongs." *Id.* at 242. He went into the yard and stabbed a prison guard "six times, once in the forehead, once in the back of the head, once in his right rotator cuff, once in his back right shoulder and twice in the back." *Id.* at 951. The guard additionally "sustained multiple fractures to his forehead, orbital bone and nose." *Id.* When another guard intervened, Walker stabbed that guard "in the neck and torso." *Id.* Even after Walker "was taken into custody," he "was still combative and punched another officer in the head." *Id.* A thirty-year veteran of the Department of Corrections and Community Supervision called the incident "one of the most violent acts of misconduct by an incarcerated individual that I recall from my entire career at DOCCS." *Id.* at 546.

As if that were not enough, Walker has received twenty-seven misbehavior reports while in prison for infractions including weapon

possession, drug possession, and threats. And that is not even to mention the murders and attempted murders that put Walker in prison in the first place. Corrections officials considered Walker to be "the fourth-most dangerous inmate in the state." *Id.* at 523.

Following the Green Haven assault, Walker received a fourteen-year term of disciplinary segregation. When that term ended in 2014, he was designated for administrative segregation because of his propensity for violence. Between 2014 and 2019, prison officials reviewed the administrative segregation forty-six times and concluded that Walker posed serious risks to prison safety that justified administrative segregation. Given Walker's history of violence, most observers would find those conclusions unsurprising.

Even the majority agrees that the officials' conclusions "may have been reasonable" and that we "owe" those conclusions "considerable deference." *Ante* at 6. And the majority purports to acknowledge that it is not "categorically 'suspect' for reviewing officials … to conclude that they should adhere to their initial safety determination." *Id.* at 9 n.5. Nevertheless, the majority holds that the "totality of the circumstances" indicates that the defendants conducted a "meaningless review." *Id.* at 9 n.5, 48 n.53. The majority criticizes the repetition of certain language in the prison officials' periodic reports; occasional delays in completing the reviews and providing copies to Walker; the lack of detailed analysis from the deputy commissioner in completing the final layer of review; and the reasoning the defendants provided. All this leads the majority to conclude that a jury should decide whether the prison officials' reports reflected "a lack of engagement" with the "positive developments" that Walker purportedly brought to their attention. *Id.* at 43.

2

As the majority explains it, "the fact that an individual was retained in Ad Seg despite years-long stretches of good behavior, without prison authorities evidencing any real recognition of that fact, provides a sound basis for a jury to infer that his reviews were not constitutionally meaningful." *Id.* at 45-46 (footnote omitted). In fact, the prison officials reasonably determined that the lack of misbehavior reports while Walker was confined in administrative segregation—where opportunities for misbehavior are limited—did not outweigh the risk he had demonstrated through his violent conduct.[1] But the court now holds that such a reasonable decision is not only impermissible but provides compelling evidence that the prison officials neglected their duties. To the contrary, the decision was amply justified for the reasons the officials identified.

Given the court's holding—that it is constitutionally suspect for prison officials to adhere to a safety determination based on pre-segregation conduct—today's opinion effectively establishes a new rule of constitutional law that prison officials must not only meaningfully review an inmate's continued administrative segregation but also provide the inmate an opportunity to demonstrate a degree of changed behavior that would overcome the officials' concern about past conduct. But the Due Process Clause does not require prison officials to provide relaxed conditions of incarceration that would allow an inmate—at the risk of other inmates

---

[1] *See* J. App'x 556 ("It is important to recognize that SHU confinement is more secure than general population, and the opportunity for Tyrone Walker to commit violent acts has been greatly reduced by his Ad Seg placement. … Tyrone Walker's behavioral record since he was placed in Ad Seg in 2014 demonstrates that the enhanced supervision allowed by that designation has significantly improved the safe and secure operation of the facility that confines him.").

and staff—to "demonstrate his improved behavior [in order] to be released from administrative segregation." Appellant's Br. 63-64. It requires only that prison officials "evaluate whether the inmate's continued Ad Seg confinement is justified." *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017). Walker has a right to meaningful *review* of his confinement, not to an opportunity for *release*. Because the court holds otherwise, I dissent.

## I

Walker entered the New York state prison system to serve a sentence of thirty-two and a half years to life for a combination of offenses that included one count of attempted robbery and two counts of second-degree murder. In 1986, Walker was adjudicated a youthful offender at seventeen years of age for attempted criminal possession of stolen property. By 1992, he was convicted of disorderly conduct and criminal sale of a controlled substance. In 1993, Walker launched the spree of violent crimes that would lead both to his current state conviction and to a federal conviction carrying a sentence of life in prison without parole. Then, throughout his time in prison, Walker became one of the most dangerous prisoners in the New York prison system—which led to his placement in disciplinary, then administrative, segregation from the general prison population.

## A

In the 1980s and 1990s, Walker sold cocaine in upstate New York. He also committed a host of violent crimes. In April 1987, "in the course of burglarizing the home of Mr. Philip Slutsky," he "directly participated in the killing of eighty-six year old Mr. Philip Slutsky inside Mr. Slutsky's home." Phase II Jury Special Finding at 5, *United States v. Walker*, No. 94-CR-328 (N.D.N.Y. Feb. 28, 1996), ECF No. 605.

A few years later, Walker attempted to commit two separate armed robberies in the same day: "armed with a gun, [he] demanded money from a man and fired a shot at him when he ran from the scene and also shot a female victim at close range." J. App'x 554. In 1993, Walker and an associate decided to rob a rival drug dealer—a man named Michael Monsour—of his money and cocaine. The two men wore masks, broke into the home of Monsour's girlfriend, tied up the people in the house, and held them at gunpoint while demanding to see Monsour. When Monsour arrived at the home, Walker shot him multiple times in the back. Five days after he killed Monsour, Walker and another man killed a forty-two-year-old Manhattan artist—Bonnie Bear—while she was loading her car outside of her apartment in Tribeca. Walker and his accomplice attempted to rob her and shot her in the neck. Four hours after that, Walker attempted to rob a Brooklyn man named Herbert Mushkin and shot at him from close range.

Prosecutors in Walker's federal trial sought the death penalty, which Walker escaped by one juror's vote. Other jurors who had witnessed the trial took the extraordinary step of protesting the failure to impose the death penalty.[2] Walker continued to engage in violence even while he was on trial. "During the federal trial, … Walker tried to hire a hit man to kill a witness, made multiple attempts to escape from county jail, assaulted a deputy in an attempt to take his keys, and stabbed another inmate 18 times." J. App'x 943. The trial record also showed that Walker had "orchestrated numerous

_____

[2] *See* John Caher, *Outraged Jurors Say Life Term Isn't Enough*, Times Union (July 23, 1996) ("Jurors outraged that a killer they convicted was spared the death penalty filed into a federal courtroom Monday in silent protest to the life sentence imposed on Tyrone Walker and the law that requires a unanimous verdict.").

gunpoint robberies, slashed and beat a woman in 1992, stabbed a fellow prisoner in the Sullivan County Jail in 1992 and attempted to take a contract out on the life of a witness."[3]  When the district judge sentenced Walker, he said, "The most appropriate thing I can do now is put you somewhere that you won't kill again, which you surely would do if you were back on the streets."[4]  Convicted of the murders of Monsour and Bear and the attempted murder of Mushkin—along with other crimes—Walker was sentenced to life in federal prison without the possibility of parole, on top of the state sentence of thirty-two and a half years to life that he received for the two attempted armed robberies.

**B**

After entering the prison system, Walker persisted in violent and criminal conduct, including the conduct leading to his twenty-seven misbehavior reports and the brutal assault at the Green Haven Correctional Facility. He was convicted of first-degree attempted murder because of that assault and received an additional sentence of fifteen years to life on top of his existing state sentence. In addition, Walker "was sentenced to a lengthy period of disciplinary confinement in the Special Housing Unit." J. App'x 330. He remained there until his disciplinary confinement ended in 2014.

Walker's "misbehavior did not stop" after he was placed in disciplinary confinement; he continued to threaten the prison population. *Id.* at 330. Walker even bragged in a letter that he was "considered one of the most dangerous prisoners in the state because I don't play if I do something." *Id.* at 597.

---

[3]  Caher, *supra* note 2.

[4]  *Id.*

On January 17, 2014—before Walker's disciplinary segregation was set to end—prison officials recommended that Walker be transferred to administrative segregation. The recommendation noted that "Walker has shown a penchant for serious violence both in the correctional setting and in the community." *Id.* at 597. In particular, "[Walker's] willingness to enact extreme violence on staff, the community and other inmates has proven his presence in general confinement of any correctional facility is an extreme risk to staff and inmates as well as the safety, security and good order of the facility." *Id.*[5] Over Walker's objections, prison officials found "substantial evidence" that Walker could not safely integrate with other inmates, and they placed him in administrative segregation. J. App'x 647.

## C

While disciplinary segregation is punitive, administrative segregation "serves a different purpose" by removing "an inmate from the general population when he 'pose[s] a threat to the safety and security of the [prison] facility.'" *Proctor*, 846 F.3d at 601 (quoting 7 N.Y.C.C.R.R. § 301.4(b) (2017)). Inmates designated for administrative segregation are separated from the general prison population because "they are deemed the most dangerous and problematic," and having several such inmates in the general population "is not in the best interest of a safe and secure prison environment." J. App'x 559. We have explained that administrative segregation "is flexible and accords DOCCS officials substantial

---

[5] *See also* J. App'x 835 ("[Walker's] ability to obtain and fashion extremely dangerous weapons, attempts to manipulate the system, unpredictable behavior and violence, as well [as] his inability to follow the rules of the facility all indicate that he would be a threat to the security and safety of himself, the facility and the population if placed in the general population.").

discretion in deciding whether to impose an Ad Seg term." *Proctor*, 846 F.3d at 601. Terms of administrative segregation "are open-ended and do not require that DOCCS predetermine when it will release an inmate." *Id.* However, we have also held that the Due Process Clause of the Fourteenth Amendment "mandates that prison officials 'engage in some sort of periodic review of the confinement' to verify that the inmate 'remains a security risk' throughout his term." *Id.* at 609 (quoting *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)).

Our review of the decision to retain an inmate in administrative segregation is limited. "Procedural due process does not permit a court to review the substance of [the] decision to confine [an inmate] in Ad Seg." *Id.* at 608. "The Due Process Clause permits only an evaluation of whether [the prison officials'] method for coming to their Ad Seg determinations is sufficient." *Id.*

## II

The question in this case is whether a reasonable jury could conclude that the prison officials' process for reviewing Walker's administrative segregation status was so deficient as to violate the Constitution. A reasonable jury could not reach that conclusion based on the record in this case.

## A

Under our precedents, the Due Process Clause entitled Walker to "meaningful" reviews of his administrative segregation status. *Id.* at 609. When Walker entered administrative segregation, state law required that prison officials review his status every sixty days. In 2017, a change in the applicable regulations altered the deadlines.

Prison officials conducted the required reviews of Walker's administrative segregation pursuant to a standard three-step process.

During the relevant period, three tiers of prison officials reviewed Walker's administrative segregation status forty-six times. The first layer of review was the Facility Committee, which included "a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff." *Id.* at 602 (quoting 7 N.Y.C.C.R.R. § 301.4(d)(1) (2017)). The Facility Committee reviewed the inmate's institutional record and prepared a report for the superintendent of the prison. *See id.*

Each time it reviewed Walker's status, the Facility Committee issued a report in three parts. The first part, "Reasons why offender was initially determined to be appropriate for administrative segregation," was substantially similar across the reports, as would be expected. The second part, "Information on the offender's subsequent behavior and attitude," varied across reports because prison officials regularly met with Walker and considered his conduct in relation to his continued administrative segregation status. The third part, "Other factors which may favor retaining the offender in or releasing the offender from administrative segregation," was again substantially similar across the reports because it focused on Walker's demonstrated "propensity for assaultive and dangerous behavior during his incarceration and in his criminal history" and his "ability to enact extreme violence on staff and other inmates." J. App'x 736, 798, 845.

The second step of the review process occurred after "the superintendent forwards the Facility Committee's report and any written response that the inmate submits to a 'Central Office Committee' located at DOCCS headquarters in Albany, New York, for 'Central Office Review.'" *Proctor*, 846 F.3d at 602. The Central Office Committee included "a representative from the office of facility operations, a member of [the DOCCS] inspector general's staff, and

an attorney from the office of counsel." *Id.* (quoting 7 N.Y.C.C.R.R. § 301.4(d)(3) (2017)). The Central Office Committee "reviews the Facility Committee's report, develops its own recommendation whether the inmate continues to pose a safety threat to the facility, and forwards the paperwork to the deputy commissioner of DOCCS." *Id.*

The Central Office Committee regularly reviewed and discussed Walker's administrative segregation status. It concluded that Walker's placement in administrative segregation was appropriate, describing his past violent conduct while considering Walker's more recent behavior. *See, e.g.*, J. App'x 929, 984, 995. Walker acknowledges that the reports of the Central Office Committee varied across reviews.[6]

The third step of the review process was the deputy commissioner's review of "the two committees' recommendations, as well as the inmate's written statement when applicable." *Proctor*, 846 F.3d at 602. At that point, "the deputy commissioner makes a final decision" about the inmate's continued administrative segregation. *Id.* "[T]he superintendent of the inmate's prison facility … [then] provides written notice to the inmate of the decision and its 'reason(s),' and a statement notifying the inmate of his right to submit a written statement in the next … review." *Id.* (quoting 7 N.Y.C.C.R.R. § 301.4(d)(4) (2017)). In each review, the deputy commissioner decided to continue Walker's administrative segregation.

---

[6] *See* Appellant's Br. 31-32 (noting that "the Central Office Committee did not copy and paste to the same level as the Facility Committee" and made regular "assessments of Mr. Walker's current behavior").

10

**B**

Walker thus received a significant amount of process in the prison officials' regular decisions to continue his administrative segregation. The majority nevertheless concludes that the forty-six reviews might have been a "sham." *Ante* at 37. The evidence does not support that conclusion.

**1**

The majority observes that portions of Walker's reviews repeated the same concerns, in the same language, to justify his administrative segregation. In the majority's view, the repetition suggests that prison officials did not show "any real recognition" of Walker's "stretches of good behavior." *Id.* at 45. Instead, according to the court, a reasonable jury could conclude that Walker's forty-six reviews were "frozen in time" and "pretextual." *Id.* at 44, 49.

But the record precludes that inference. Prison officials considered Walker's ongoing conduct, including meritorious aspects of his disciplinary record, in each of their reviews. Before each review, a member of the Facility Committee met with Walker to discuss updates in his circumstances, and the Committee's reports note positive developments in Walker's favor. For example, the reports identify how long Walker has gone without an incident, explain whether he "has maintained a positive disciplinary record" since his last review, and even note that he "seems to have made progress in controlling his aggressive patterns."[7] The Central Office Committee regularly commented on Walker's behavior during each review

---

[7] *See, e.g.,* J. App'x 736, 739, 749, 752, 755, 760, 767, 770, 777, 781, 787, 790, 795, 798, 801, 804, 808, 812, 815, 819, 833, 836, 839, 842, 858, 863, 873, 895, 905, 920, 928, 935, 942, 949, 957, 966, 974, 983, 992.

period, noting that "Walker has … maintained appropriate behavior" or that "his assault on Correctional staff … occurred more than 20 years ago."[8] Walker himself repeatedly referenced his streak of non-violent behavior in letters to the Central Office Committee. The defendants sometimes commented on the letters in the official reports. *See, e.g.*, J. App'x 993. "Despite this good trend," however, prison officials decided that they needed to "recommend[] that [Walker] remain in Administrative Segregation" due to "his unpredictable violence." *Id.* at 897. The record does not permit the conclusion that Walker's reviews were "forever rehashing information addressed at [his] initial Ad Seg determination." *Proctor*, 846 F.3d at 611. It shows the opposite: the officials reached the same determination *after* considering any new circumstances.

Even the majority admits that the defendants considered positive aspects of Walker's behavior. *See ante* at 47. It nevertheless criticizes the prison officials for considering Walker's good behavior as only limited evidence of reform because Walker had fewer opportunities to act violently while he was segregated. *Id.* at 47-49. The court describes this reasonable evaluation of the evidence as "striking," "troubling," and "patently circular." *Id.* at 42, 47, 48. But it is none of those things. Circular reasoning occurs when, in support of a challenged proposition, the speaker invokes the proposition itself. Here, the challenged proposition is that Walker's non-violence while confined in administrative segregation does not establish that he would be non-violent when placed in the general population. In support of that proposition, prison officials explained that administrative segregation provides fewer opportunities to act

---

[8] *See, e.g.*, J. App'x 738, 747, 751, 754, 765, 769, 776, 785, 797, 806, 810, 835, 838, 841, 844, 846, 859, 862, 887, 897, 906, 936, 943.

12

violently, so a relatively non-violent disciplinary record during a period of administrative segregation is less probative of whether Walker would act violently in the general prison population than his prior history of violence when he actually was placed in the general prison population.

Whether an inmate's conduct in a restrictive environment is probative of how he will behave in an unrestricted environment *should* be evaluated with reference to the differences in the two environments. There is nothing circular about such an analysis. Indeed, it is a familiar way of evaluating evidence. A factfinder will consider a defendant's confession, for example, in light of "the physical and psychological environment that yielded the confession," which may "be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In fact, all testimony should be evaluated by reference to "[t]he motivation of a witness in testifying, including her possible self-interest." *United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) (quoting *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994)). It was neither circular nor in any way suspect for the prison officials to evaluate the probative value of Walker's conduct—on the ultimate issue of whether he could safely return to the general population—in light of the physical and psychological environment in which that conduct occurred. Prison officials may permissibly rely even "on 'purely subjective evaluations and on predictions of future behavior.'" *Hewitt*, 459 U.S. at 474 (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). In this case, the officials conducted a reasonable evaluation of the evidence, assigning each aspect of Walker's record the probative weight they determined it was due.

When the majority insists that "a reasonable juror could conclude that Walker's reviewers did not consider his positive

disciplinary record," *ante* at 43, it is not saying that the reviewers overlooked that evidence. Rather, the court disagrees with the evidentiary weight the reviewers assigned that record and holds that the positive disciplinary record should have been considered more probative of Walker's rehabilitation than prison officials concluded it was. [9] But disagreeing with prison officials' evaluation of the available evidence is exactly what we are not allowed to do in this context. "Procedural due process does not permit a court to review the substance of [the] decision to confine [an inmate] in Ad Seg." *Proctor*, 846 F.3d at 608. "We may not substitute our judgment" for that of the prison officials "nor may we rebalance the [applicable] criteria" under the state regulations. *Id.* We may evaluate only whether the "method for coming to their Ad Seg determinations" was so deficient as to amount to a sham. *Id.* In this case, however, the majority identifies a constitutional violation not because of a lack of meaningful process but because it disagrees with how prison officials interpreted the evidence. *But see Hewitt*, 459 U.S. at 472 ("Prison administrators should be accorded wide-ranging deference … to preserve internal order and discipline and to maintain institutional security.") (alteration omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). That is a dramatic departure from applicable precedent.

**2**

The majority further dilutes the deference due to prison officials by rejecting the presumption of regularity. "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they

---

[9] *See, e.g., ante* at 43 ("[A] reasonable juror could conclude that Walker's reviewers did not consider his positive disciplinary record … *as relevant to their decision*.") (emphasis added).

14

have properly discharged their official duties." *NARA v. Favish*, 541 U.S. 157, 174 (2004) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). We must "presume" that a government official "has taken into account all of the evidence before him, unless the record compellingly suggests otherwise." *Xiao Ji Chen v. USDOJ*, 434 F.3d 144, 159 n.13 (2d Cir. 2006).

In this case, the record shows that the defendants considered Walker's positive disciplinary record in administrative segregation—such as it was—and concluded nevertheless that Walker continued to pose a security risk. The fact that the reviewers repeated similar language when describing this conclusion—across the forty-six reports that they wrote—does not provide clear evidence that the reviewers did not meaningfully consider the evidence before them. Nor do typographical errors or mistaken dates provide such evidence. None of this nitpicking allows the inference that the periodic reviews of Walker's administrative segregation status were unconstitutionally meaningless. The majority seems to acknowledge as much, *see ante* at 42, even noting that "[b]ureaucracies often operate inefficiently and generate errors of various innocent sorts," *id.* at 57, and that the alleged deficiencies in the review process would not create triable issues of fact standing alone.[10]

---

[10] *See, e.g., ante* at 9 n.5 ("We take no position as to whether some of the facts here, viewed in isolation, would raise a triable issue as to the degree of process Walker received."); *id.* at 42 ("We do not suggest that the repeated use of certain material across reviews, without more, necessarily creates a triable issue of fact."); *id.* at 52-53 ("We do not hold, here, that the delay in completing and providing reviews could, in and of itself, amount to a constitutional violation."); *id.* at 57 ("DOCCS officials' failure to follow the portion of § 301.4(d) that provided Walker an opportunity to respond to his reviews cannot, in itself, establish a Due Process violation.").

15

Instead, the majority jettisons the presumption of regularity that normally applies when we evaluate government action. The court dramatically announces that "the presumption has no appropriate application here." *Ante* at 44 n.48.

In a footnote in *Proctor*, our court said that the defendants in that case had cited "no case, and we cannot find one, that applies such a presumption in a constitutional challenge to state prison officials' periodic review of Ag Seg," so we "decline[d] to do so." 846 F.3d at 608 n.4. The Supreme Court, however, has made clear that the presumption of regularity does not disappear when constitutional rights are at stake. The Supreme Court has applied the presumption of regularity in actions alleging prosecution in retaliation for speech in violation of the First Amendment, *see Nieves v. Bartlett*, 587 U.S. 391, 400 (2019); alleging that the petitioners were targeted for deportation based on membership in a political group, *see Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 489 (1999); and alleging selective prosecution based on race, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996). The Court has cautioned that the presumption of regularity must not be "lightly discard[ed]" because "judicial intrusion into executive discretion" must remain "minimal." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). There is no support for the majority's sweeping declaration that the presumption must be discarded when an inmate asserts a due process challenge to state prison administration.

The majority attempts to justify its evasion of precedent by asserting that the presumption applies only to cases that implicate "separation of powers concerns." *Ante* at 43 n.48. But this case *does* implicate such concerns. State prison officials exercise the executive power under state law and have considerable discretion to decide how to administer state correctional facilities. As much as the

16

decisions of a federal official, the decisions of a state official "receive a presumption of regularity," *Nieves*, 587 U.S. at 400, and "[t]his presumption of regularity applies equally to a state official's compliance with state law," *Hebrard v. Nofziger*, 90 F.4th 1000, 1009 (9th Cir. 2024).

If anything, this context requires *more* deference to public officers than other cases in which the presumption applies. Courts are "ill equipped to deal with the … urgent problems of prison administration." *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 126 (1977) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). "[E]ven where claims are made under the First Amendment" or another constitutional provision, judges must not "substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987) (internal quotation marks, alteration, and citation omitted). "Moreover, where *state* penal institutions are involved, federal courts have a further reason for deference." *Procunier*, 416 U.S. at 405 (emphasis added). "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973). "Principles of federalism and separation of powers dictate that exclusive responsibility for administering state prisons resides with the State and its officials." *Lewis v. Casey*, 518 U.S. 343, 364 (1996) (Thomas, J., concurring).

Given the state interests at stake, the prison officials here should receive (1) the normal presumption of regularity for public officials as well as (2) the deference due to expertise in prison administration and (3) the "further" deference required to respect the

federalism interest in allowing a state to govern its own penal system. *Procunier*, 416 U.S. at 405. The majority, however, blows past all these doctrines to conduct a *de novo* review of the internal reports of a state prison bureaucracy. And it invites a jury to nitpick those reports to decide whether the prison officials exhibited a sufficient level of "engagement" with the arguments of a prison inmate. *Ante* at 43. There is no justification for that approach.

Even without entertaining any presumption, it remains implausible that the defendants here engaged in forty-six sham reviews. The plaintiff and the court instead disagree with the results.

**3**

It might be difficult for Walker to demonstrate the sort of rehabilitation that would overcome concerns about his past violent conduct, especially in the restricted conditions of administrative segregation. But the Due Process Clause does not require that prison officials make it easy. Indeed, the Central Office Committee expressly "recognize[d] the conundrum inherent in requiring a demonstration of growth and non-violent problem solving while continuing administrative segregation." J. App'x 748. The Constitution requires only that those officials consider the evidence before them and make a meaningful assessment. The record does not compellingly suggest that they failed to do so. *See Xiao Ji Chen*, 434 F.3d at 159 n.13; *Favish*, 541 U.S. at 174.

The court's decision today can be justified only by its agreement with Walker that he was entitled not only to meaningful review of his administrative segregation but also to an opportunity to "demonstrate his improved behavior [in order] to be released from administrative segregation." Appellant's Br. 63-64. No prior case law establishes an inmate's right to such an opportunity. There is "no

18

support" for the "contention that defendants were constitutionally required to provide criteria for [an inmate's] progression and reintegration into general population through good behavior" and to offer an opportunity to meet those criteria. *Williams v. Norris*, 277 F. App'x 647, 650 (8th Cir. 2008). Prison officials "need only have provided him with meaningful review of his status and the reasons for his continued ad seg confinement." *Id.*

Even so, the argument that the prison officials denied Walker the novel right the majority effectively endorses—a right to the opportunity for release—relies on a distortion of the record. The majority notes that in one review—dated December 4, 2018—the Central Office Committee observed that "Walker will always remain a risk for violence because of his history of unexpected assaults." J. App'x 780. And "[i]n two other reviews, the Committee wrote that continued good behavior could help Walker 'earn additional incentives while in Administrative Segregation.'" *Ante* at 51-52 (quoting J. App'x 906). According to the majority, this latter statement "suggest[ed] that while incentives might have been on the table, release from Ag Seg was not." *Id.* at 52.

Put aside for the moment the implicit assumption that the purely procedural right to meaningful review of administrative segregation entails an opportunity for release. The full context of the Committee's statements precludes the inference that release from administrative segregation was off the table. In the December 2018 review, immediately after noting that Walker would always be a security risk, the Committee explained that it was possible for Walker to move out of administrative segregation:

> Walker must exhibit insight into his own behavior and reactions to be considered a candidate for a transition to a less restrictive environment. The committee

19

recommends that inmate Walker speak with his Offender Rehabilitation Coordinator about being added to the waitlist for the ART and ASAT workbook programs. Programming may better prepare inmate Walker for eventual transition to a less restrictive environment. Administrative segregation remains appropriate at this time.

J. App'x 780. [11] In other words, the Central Office Committee observed that Walker would always pose a risk of violence given his past conduct but that it was still possible for Walker to become "a candidate for a transition to a less restrictive environment." It is hard to see how this statement shows a violation of the Due Process Clause. In fact, it went beyond the requirements of due process because it *did* suggest "criteria for … progression and reintegration into general population through good behavior." *Williams*, 277 F. App'x at 650.

These statements of the Committee did not assign Walker the "burden of demonstrating entitlement to housing with the general population." *Ante* at 46 n.51. The majority itself accepts that Walker's "prior violent acts are worthy of significant emphasis" and "cannot be ignored when attempting to predict whether he might pose a danger to facility security and safety." *Id.* at 42. The Committee straightforwardly recognized the indisputable facts that (1) Walker's history of violence supported administrative segregation and (2) there needed to be evidence pointing in the other direction to support release. Walker himself recognized as much because, as the majority notes, "[i]n almost every submission [to the Central Office Committee], Walker requested that DOCCS advise him what he could

---

[11] Walker eventually completed the ART program but was unable to complete the ASAT program because it did not exist in workbook form. *See* J. App'x 736, 747.

do to demonstrate that he could safely be released from Ad Seg." *Id.* at 30.

Yet the Constitution did not require the prison officials "to provide criteria for [Walker's] progression and reintegration into general population through good behavior," *Williams*, 277 F. App'x at 650, even though they did so. And the Constitution certainly did not require the defendants to assign enough probative weight to Walker's behavior in administrative segregation for him to secure release. "Defendants need only have provided him with meaningful review of his status and the reasons for his continued ad seg confinement." *Id.* That is what they did, and today's opinion departs from established precedent in requiring more.

## III

Despite all its disagreements with the controlling case law, the majority suggests that it is merely following our prior holding in *Proctor*. *See ante* at 37-41. It is not. In *Proctor*, testimony from prison officials established that the review of administrative segregation status was not meaningful. There is no such evidence in this case.

## A

In *Proctor*, prison officials testified that "once an inmate is placed in Ad Seg, they're never released to the general population" and that an inmate's subsequent behavior "plays no role in the decision whether or not to maintain him in Ad Seg." *Proctor*, 846 F.3d at 605 (internal quotation marks and alterations omitted). One prison official even "confirmed that Ad Seg is used for disciplinary reasons." *Id.* at 606 (internal quotation marks and alteration omitted). We held that Proctor had "raised triable factual questions as to whether his … reviews have been constitutionally meaningful" because the

21

"[d]efendants' statements indicate that Proctor's … reviews in particular are no more than hollow formalities." *Id.* at 612.[12]

In this case, Walker has not identified any evidence remotely as compelling. The reviews instead show that prison officials considered Walker's recent behavior but decided that he remained at high risk of acting violently if returned to the general population. Walker did testify that, in a meeting in which he asked about being released from administrative segregation, two members of the Facility Committee purportedly said that they "would never recommend [he] be released." J. App'x 487. Even crediting Walker's account of what these officials purportedly said, the comments of two officials expressing a prediction about the merits of Walker's case before conducting subsequent reviews would not establish that the years-long, multi-layered series of forty-six reviews amounted to a sham.[13] "The mere

---

[12] The Eighth Circuit has relied on similar testimony to conclude that an inmate's periodic administrative segregation reviews were not meaningful. *See Williams v. Hobbs*, 662 F.3d 994, 1008 (8th Cir. 2011) ("[One warden] consistently testified at trial that seven[]years' worth of clean history was irrelevant to him, and [an assistant warden] confirmed that, even if Williams proved to be 'the perfect model citizen' or 'model prisoner,' his vote as [assistant] [w]arden would always be that Williams remain in [administrative segregation] in light of his past transgressions.").

[13] *Cf. Spann v. Lombardi*, 65 F.4th 987, 993 (8th Cir. 2023) ("Spann complains that one of the decisionmakers allegedly prejudged the disciplinary decision by asserting Spann's guilt in an e-mail to a colleague before the hearing. He cites no authority, however, that an official who expresses a view on a disciplinary matter before the hearing occurs is not a 'neutral decisionmaker' or otherwise deprives the inmate of due process. No final disciplinary decision was rendered in Spann's matter until the decisionmakers conducted a hearing and received Spann's submission. We may assume that it would be best for a decisionmaker to withhold comment

existence of a scintilla of evidence in support of [Walker's] position will be insufficient; there must be evidence on which the jury could reasonably find for [him]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B**

In the absence of the sort of evidence identified in *Proctor*, the majority relies on "red flags" in the prison officials' reviews. The officials, for example, "discounted Walker's good behavior by attributing it to the conditions of his solitary confinement." *Ante* at 47. It is entirely reasonable to conclude that good behavior in a restricted environment is not especially probative evidence. *See supra* Part II.B.1. But even putting that aside, it is not even true that the defendants here—unlike the defendants in *Proctor*—"dismiss[ed] [Walker's] good behavior as irrelevant." *Proctor*, 846 F.3d at 613. They considered his good behavior but determined that the behavior did not outweigh Walker's prior violence. The majority even accepts that such a determination may result from a meaningful review: "[W]e do not suggest that some quantum of good behavior can necessarily overcome a professional penal judgment based on DOCCS employees' on-the-ground evaluation of an individual's current risk of violence." *Ante* at 45. But despite that disclaimer, the court decides precisely that: there must be some quantum of good behavior that overrides the prison officials' assessment of the risk of violence based on past conduct. Otherwise, "a reasonable juror could conclude that Walker's reviews were frozen in time" and that the defendants relied on Walker's "remote violent conduct … as a pretext for their desire to

---

until the proceedings are completed, but there is no clearly established constitutional right to that pristine process.").

23

keep in him Ad Seg." *Ante* at 44-45 (internal quotation marks omitted).

The majority faults the Central Office Committee for "repeatedly … us[ing] Walker's attempts to participate in his Ad Seg review process as a reason for keeping him" in administrative segregation. *Id.* at 49. In its review of June 17, 2019, the Committee noted that "[d]uring this review, inmate Walker's letter … expressed entitlement and frustration" and stated that "[r]elease from [a]dministrative segregation for inmate Walker will require a level of humility and remorse that has thus far not been demonstrated." J. App'x 748.[14] The majority objects to the Committee noting Walker's "sense of entitlement."[15] The majority believes that this consideration

---

[14] The Committee explained:

> Rather than reflect on the lessons of ART [an anger management program] [Walker] stated that he passed "with ease." Rather than see ASAT [a substance abuse program] as another opportunity for personal growth, he stated that he doesn't need ASAT because "I don't have a drug problem anyway." … The only staff member he named in his letter [to the Committee] was derided as corrupt—a sign that he has a problem communicating respectfully. He closed his letter with the entitled inference that if he received a meaningful review he would be released from administrative segregation.

J. App'x 747-48.

[15] *See* J. App'x 800 ("Inmate Walker maintains a sense of entitlement, always requesting something extra, and when he does not get what he wants he reacts with anger."); *id.* at 803 (same); *id.* at 807 (same); *id.* at 814 (same); *id.* at 841 (same). According to the majority, the Committee made these statements in response to Walker "request[ing] things to which he was in fact entitled," including "medical care, legal resources, and copies of his own Ad Seg reviews." *Ante* at 49. In addition to those things, however, Walker demanded "packages, TV, commissary, and trailer visits." J. App'x 801; *see also id.* at 812 (stating that Walker was "requesting a television in his

was improper because it is not persuaded of "the connection between a 'sense of entitlement' and the safety and security of a facility." *Ante* at 49 n.55.

In my view, the assessments of Walker's attitude were reasonable. But that is beside the point. Even assuming that the Committee drew inferences against Walker that it should not have drawn, those inferences would implicate the substance of the Committee's decisions, not the sufficiency of the process that Walker received. "Procedural due process does not permit a court to review the substance of Defendants' decision to confine [an inmate] in Ad Seg. We may not substitute our judgment for Defendants'." *Proctor*, 846 F.3d at 608 (citation omitted).

In the absence of other evidence—such as the deposition testimony in *Proctor*—to indicate that the review process was a sham, whatever disagreement the majority may have with the Committee's characterization of Walker's attitude does not implicate the Due Process Clause. Perhaps some judges would not conclude from Walker's communications with the Committee that he was "entitled," had "a problem communicating respectfully," or failed to demonstrate "personal growth." J. App'x 747-48. Some judges might consider such an attitude to be irrelevant to prison safety while others might believe that the attitude indicates a lack of remorse or acceptance of responsibility. *Cf. Hewitt*, 459 U.S. at 474 (noting that prison officials must rely "on purely subjective evaluations and on predictions of future behavior") (internal quotation marks omitted). But our review is limited to "whether Defendants' method for coming

---

cell, Administrative Segregation Commissary Buys, Food Packages and Family Reunification Privileges"). He was not entitled to those things. *See id.* at 122.

to their Ad Seg determinations is sufficient," not whether it was correct. *Proctor*, 846 F.3d at 608.

C

The majority doubts that the deputy commissioner engaged in more meaningful review than a "rubber stamp" because he provided "generic" reasons for continuing the administrative segregation—and those reasons appear to have been transcribed on his behalf by an employee. *Ante* at 46. Again, "[i]n the absence of clear evidence to the contrary, courts presume that Government agents have properly discharged their official duties," *Favish*, 541 U.S. at 174 (alteration omitted) (quoting *Armstrong*, 517 U.S. at 464), and neither generic reasoning nor the assistance of subordinates provides such clear evidence. Even without that presumption, nothing in the Constitution requires a government official to replicate the analysis of a recommendation he adopts or to transcribe the explanation with his own hand. The Committees submitted reports providing recommendations to the deputy commissioner, and the deputy commissioner reviewed and accepted those recommendations. This ordinary administrative process raises no suspicion that the deputy commissioner violated the Due Process Clause.

The actions of the deputy commissioner in this case bear no resemblance to the actions of the deputy commissioner in *Proctor*. In that case, the deputy commissioner provided sworn testimony in which he could not even "articulate a reason why Defendants have continued to hold Proctor in Ad Seg." *Proctor*, 846 F.3d at 613. In this case, by contrast, the deputy commissioner explained that he "consider[ed] all factors of [Walker's] behavior," taking into account that "[h]is misconduct became less frequent and much less serious" over time. J. App'x 547. But the deputy commissioner said that he

26

ultimately "was not yet assured that removing him from Ad Seg would adequately protect the safe and secure operation of the prison" given Walker's record of "violent behavior." *Id.* That is a meaningful and reasonable explanation.

## D

The majority additionally holds that occasional delays in completing Walker's reviews or in giving him copies of the reports demonstrate a violation of the Due Process Clause. The majority identifies two times that the deputy commissioner completed a review while a prior review remained pending. *See ante* at 53. Based on this fact, the court explains, "[a] reasonable juror could conclude that the delay supported a conclusion that the Deputy Commissioner's review was not meaningful regarding these earlier periods, since he had already decided that Walker should be retained in Ad Seg through a later date." *Id.*

That holding weirdly attributes constitutional significance to a pedestrian delay in bureaucratic paper-pushing. We have previously rejected the argument that a "consistent failure to finish [the administrative segregation] reviews before the next review cycle began" established that the reviews were not meaningful. *H'Shaka v. O'Gorman*, 758 F. App'x 196, 200-01 (2d Cir. 2019). When "there is no evidence regarding the reason for the delays," the delays themselves do not establish the lack of a meaningful process. *Id.* at 201. The court's new holding that bureaucratic delay in completing forms could amount to a constitutional violation—and therefore justifies a trial against state officials—will lead "to the involvement of federal courts in the day-to-day management of prisons," contradicting the instructions of the Supreme Court "that federal courts ought to afford appropriate deference and flexibility to state officials trying to

27

manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995).

The majority objects to delays in providing Walker with copies of his reviews on the timeline that state regulations required. *See* 7 N.Y.C.C.R.R. § 301.4(d)(4) (2017). Such delays left Walker with purportedly insufficient time "to address the Committees' reasons before it was time to complete his next review," so "a reasonable juror could infer from these facts that DOCCS failed to give Walker an opportunity to respond to its reasons for keeping him in Ad Seg because the reviewing officials planned to keep him there no matter what he said." *Ante* at 54, 56-57.

Again, the court elevates commonplace features of a bureaucratic process to constitutional status. It would be irrational for a juror to conclude that the delays indicate a constitutionally defective review process. The majority itself acknowledges that prison officials considered the comments Walker submitted in response to the reports—and even changed the reports in response to Walker's input. *See id.* at 54-55. Before each review, a member of the Facility Committee spoke with Walker, and Walker routinely submitted written comments for the deputy commissioner's consideration.[16] The bureaucratic delay in providing Walker with some of his reviews does not support the inference that, despite the express evidence to the contrary, prison officials did not consider anything he said. *See Anderson*, 477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the plaintiff.").

The Constitution is not implicated whenever a prison official fails to meet a regulatory deadline. "[A] violation of state regulations

---

[16] *See, e.g.*, J. App'x 756, 779, 821, 875, 1003, 1026.

28

is not 'enough generally to establish a constitutional claim.'" *Baltas v. Maiga*, 119 F.4th 255, 264 (2d Cir. 2024) (quoting *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995)). Even if the prison officials violated a state regulation, "a violation of state law does not *per se* result in a violation of the Due Process Clause." *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019). Instead, the "minimum procedural requirements" of due process are "a matter of federal law" and "are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (alteration omitted) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). The majority recognizes this well-established principle, *see ante* at 57, but it then insists—in violation of the principle—that the failure to meet the regulatory deadline "raises a genuine issue of material fact as to whether Walker's reviews were meaningful," *id.* at 58.

The court suggests that Walker was denied the "notice" and "fair opportunity for rebuttal" that the Due Process Clause requires. *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005). Yet that is entirely implausible when everyone agrees that Walker received—and participated in—forty-six reviews over the course of five years.

**IV**

It cannot be that the Due Process Clause prohibits prison officials from recognizing that past conduct establishes a future risk. In the course of its opinion, even the majority must admit that Walker's prior conduct "cannot be ignored," *ante* at 42, and that "prison officials were entitled to 'accord significant weight' to those past events," *id.* at 45 (alteration omitted) (quoting *Proctor*, 846 F.3d at 611). As one member of the Central Office Committee explained:

> In my experience, past behavior is a significant tool to gauge future behavior. Incarcerated individuals with a significant history of unprovoked violence, such as Tyrone Walker, frequently repeat this behavior. To someone unfamiliar with a corrections setting, this behavior can seem illogical and even contrary to the incarcerated individual's own best interest. However, experience and history demonstrate that this type of behavior can repeat itself and its illogical nature can make an incarcerated individual particularly hazardous to the safe and secure operation of a facility.

J. App'x 1055. The Third Circuit has held that prison officials may keep an inmate in administrative segregation "merely because his prior crimes reasonably foreshadow future misconduct," given that "predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court." *Shoats v. Horn*, 213 F.3d 140, 146 (3d Cir. 2000) (citing *Hewitt*, 459 U.S. at 474).

It is difficult to see what was constitutionally objectionable about the periodic reviews that Walker received except by reference to the court's new rule that prison officials must not only meaningfully review an inmate's continued administrative segregation but also provide the inmate an opportunity to demonstrate a degree of changed behavior that would overcome concerns about past conduct. This new rule was not clearly established at the time of the reviews in this case. For that reason, the defendants are at least entitled to qualified immunity.

Qualified immunity protects officials from liability unless their conduct "violate[s] clearly established statutory or constitutional rights." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A right is "clearly established" if "every reasonable official" would have understood that the alleged

30

conduct violates that right. *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A reasonable official would have thought that he had complied with the Due Process Clause by regularly revisiting the question of whether Walker's violent propensities, as demonstrated by his past conduct, justified continued administrative segregation, despite the lack of misbehavior while Walker was so confined.

"Qualified immunity was made for situations like this. Balancing inmates' rights and trying to keep everyone safe isn't an easy task. That's why wardens get 'wide-ranging deference' in their judgment calls." *Finley v. Huss*, 102 F.4th 789, 829 (6th Cir. 2024) (Thapar, J., concurring in part and dissenting in part) (quoting *Hewitt*, 459 U.S. at 472). A reasonable official could not have anticipated that our court would decide that it violated the Constitution for internal reports to reflect the Facility's Committee's "adherence to its original rationale for holding Walker in Ad Seg." *Ante* at 44. The majority even admits that "the judgment is a close one" and that no individual act of a prison official amounted to a constitutional violation by itself. *Id.* at 9. Instead, some mysterious confluence of the "totality of the circumstances" is what violated the Constitution. *Id.* at 9 n.5.

A case "in which the constitutional question is so factbound" cannot reflect the "violation of clearly established law." *Pearson*, 555 U.S. at 237-39. "[O]ur inquiry focuses on the specific factual situation the officers confronted, and the defendants will be entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022) (internal quotation marks and alterations omitted). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "An official is thus qualifiedly immune from liability unless, under the particular

31

circumstances the official faced, any reasonable official would have known for certain that the conduct was unlawful under then-existing precedent." *NRA v. Vullo*, No. 21-0636, 2025 WL 1966596, at *9 (2d Cir. July 1, 2025) (internal quotation marks omitted).

In this case, the particular conduct that the majority holds to be illegal involves "a lack of engagement" in written reports with the "positive disciplinary record" of an otherwise violent inmate while he was confined in administrative segregation. *Ante* at 43. The reports expressly acknowledged "positive" aspects of Walker's record but determined that administrative segregation remained appropriate based on past violence. Today the court holds that those reports were unconstitutional because the analysis was too "rote." *Id.* at 44. When we evaluate a claim of qualified immunity, "we must not and do not demand that every government official become skilled in guessing the future path of the law." *Murray v. Gardner*, 741 F.2d 434, 439 n.2 (D.C. Cir. 1984). Today's constitutional holding was especially hard to predict.

\*　　\*　　\*

The Due Process Clause requires meaningful periodic review of administrative segregation. *See Proctor*, 846 F.3d at 610. The prison officials regularly reviewed Walker's case and concluded that continued confinement was appropriate due to his violent history. Because Walker has not identified evidence that would allow a reasonable jury to conclude that this review process was a sham, the district court properly granted summary judgment. Even if the majority has now established Walker's proposed rule that the Due Process Clause requires not only meaningful review but also an opportunity for release—or some more ambiguous rule that requires close analysis of an inmate's lack of misbehavior in administrative

32

segregation—that rule was not clearly established at the time of the conduct giving rise to this lawsuit. Accordingly, the defendants are entitled to qualified immunity. Either way, the judgment of the district court should be affirmed. I dissent.